# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | C.A. No. 09-369-SLR |
| HELEN GOLDSTEIN, THE HELEN GOLDSTEIN INSURANCE TRUST, JONATHAN S. BERCK, individually and as Trustee of The Helen Goldstein Insurance Trust, THOMAS LASKARIS, individually and as Trustee of The Helen Goldstein Insurance Trust, XLI HOLDINGS, LLC, FRANK B. WEISZ, FRANK B. WEISZ AND ASSOCIATES, P.C. and HIGHLAND CAPITAL BROKERAGE, INC., | ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

**AMERICAN GENERAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

COOLEY MANION JONES LLP
Jason A. Cincilla (#4232)
Amaryah K. Bocchino (#4879)
500 Delaware Avenue, Suite 710
Wilmington, DE  19801
(302) 657-2100
jcincilla@cmjlaw.com
abocchino@cmjlaw.com
 *Attorneys for Plaintiff*
 *American General Life Insurance Company*

**OF COUNSEL**
Robert P. Lesko
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
33 Washington Street
Newark, NJ 07102-3017
(973) 735-5779
robert.lesko@wilsonelser.com

939175.11

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ..............................................................1

SUMMARY OF ARGUMENT ...............................................................................2

STATEMENT OF FACTS

    A.    Stranger-Originated Life Insurance (STOLI) Defined ............................................4

    B.    STOLI Transactions are Widely Recognized as a Substantial
        Threat to the Public at Large..................................................................5

    C.    The Policy at Issue Here Was Manufactured as Part of an
        Illegal STOLI Scheme ............................................................................7

    D.    Defendants Intentionally Misrepresented Goldstein's Income
        and Net Worth and Reason for the Policy and Concealed Their
        Intention to Transfer the Policy to Third Parties for Profit...................................10

    E.    Defendants Certified that All of the Information Provide to
        American General Was True and Complete in Order to Induce
        American General to Rely Upon Their Representations and
        Issue the Policy ....................................................................................12

    F.    Laskaris, Weisz and Weisz's Associates Have Been Engaged
        in a Pattern and Practice of Illegal STOLI Transactions ......................................14

LEGAL ARGUMENT

    I.    AMERICAN GENERAL HAS PLEADED FACTS SUFFICIENT
        TO ESTABLISH THAT EACH CAUSE OF ACTION IS PLAUSIBLE.............17

    II.    THE AMENDED COMPLAINT ESTABLISHES A
        REASONABLE EXPECTATION THAT DISCOVERY WILL
        REVEAL EVIDENCE OF EACH DEFENDANT'S FRAUD.............................19

        A.    Each of the Defendants, Including Laskaris and XLI,
            Participated in the Fraud ...........................................................21

        B.    The Misrepresentations Were Material.....................................................23

        C.    American General Justifiably Relied on the Misrepresentations
            to its Detriment ......................................................................25

D.      Weisz' Misrepresentation of Goldstein's Present Intent to
        Liquidate Assets and Fund the Policy Constitutes Actionable
        Fraud ........................................................................................27

III.    THE AMENDED COMPLAINT ESTABLISHES A REASONABLE
        EXPECTATION THAT THE TRUST LACKED INSURABLE
        INTEREST AT THE TIME THE POLICY WAS ISSUED.................................29

        A.      The Complaint Sufficiently Pleads that No Insurable Interest
                Existed at the Time the Policy Was Delivered .........................................30

                1.      Statutory Definitions of Insurable Interest....................................30

                2.      Time as of Which Insurable Interest Must Exist ...........................31

        B.      Intent to Sell the Policy Invalidates Insurable Interest .............................32

                1.      Defendants' arguments lack support as *Evans* and
                        *Paulson* are inapposite, especially at the pre-discovery
                         pleadings stage ..............................................................................33

                2.      Mutual intent is not required..........................................................34

                3.      Intent, mutual or otherwise, may be inferred from conduct ..........37

IV.     THE AMENDED COMPLAINT ESTABLISHES A REASONABLE
        EXPECTATION THAT AMERICAN GENERAL IS ENTITLED TO
        RETAIN PREMIUMS TO BE RESTORED TO ITS STATUS QUO
        ANTE.............................................................................................39

V.      THE AMENDED COMPLAINT RAISES A REASONABLE
        EXPECTATION THAT DEFENDANTS CONSPIRED TO
        COMMIT FRAUD UPON AMERICAN GENERAL..........................................44

VI.     THE AMENDED COMPLAINT RAISES A REASONABLE
        EXPECTATION THAT AMERICAN GENERAL WILL BE
        ENTITLED TO PUNITIVE DAMAGES...............................................................47

VII.    THE AMENDED COMPLAINT RAISES A REASONABLE
        EXPECTATION THAT WEISZ AND WEISZ AND ASSOCIATES
        ASSUMED AND BREACHED A FIDUCIARY DUTY ....................................50

VIII.   THE GIST OF AMERICAN GENERAL'S CLAIMS AGAINST
        WEISZ IS INTENTIONAL FRAUD ....................................................53

IX.     LEAVE TO AMEND SHOULD BE GRANTED IF THE COURT
        BELIEVES THAT THE PRESENT COMPLAINT IS INADEQUATE
        TO STATE A CLAIM .............................................................................................55

CONCLUSION..................................................................................................................................56

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AXA Equitable Life Insurance Co. v. Infinity Financial Group*, 608 F. Supp. 2d 1349 (S.D. Fla. 2009)................................................................................................36, 55

*America General Life Insurance Co. v. Schoenthal Family, LLC*, 555 F.3d 1331 (11th Cir. Ga. 2009) ...........................................................................................................24

*Amendolia v. Rothman*, 2003 U.S. Dist. LEXIS 22719 (D. Pa. 2003)............................50

*Angrisani v. Capital Access Network, Inc.,* 175 Fed. Appx. 554 (3d Cir. 2006) .........................27

*Anspach v. City of Philadelphia*, 503 F.3d 256 (3d Cir. 2007) ....................................14

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)................................................................1, 17

*Barkauskie v. Indian River Sch. District*, 951 F. Supp. 519 (D. Del. 1996) ................50

*Becher v. University of Neb.*, 191 F.3d 904 (8th Cir. 1999)...........................................55

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).........................................1, 17

*Biggins v. Markell*, 2009 U.S. Dist. LEXIS 89213 (D. Del. Sept. 25, 2009)...............18

*Borden v. Paul Revere Life Insurance Co.*, 935 F.2d 370 (1st Cir. Mass. 1991).........................42

*Brookins v. Red Clay Consolidated Sch.*, 2009 U.S. Dist. LEXIS 115459 (D. Del. Dec. 11, 2009) ......................................................................................................18

*Browning-Ferris Industrial v. Kelco Disposal Inc.*, 492 U.S. 257 (1989)...................47

*China Resource Products v. Fayda International*, 788 F. Supp. 815 (D. Del. 1992) .................45

*Christidis v. First Pennsylvania Mortg., Trust*, 717 F.2d 96 (3d Cir. Pa. 1983).........................20

*Contawe v. Crescent Heights of America, Inc.*, 2004 U.S. Dist. LEXIS 20344 (D. Pa. 2004) .....................................................................................................................50

*Emcore Corp. v. PriceWaterhouseCoopers LLP*, 102 F. Supp. 2d 237 (D.N.J. 2000)...............45

*End of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168 (D. Del. 2000) ......................................................20

*First United Bank & Trust v. PNC Finance Services Group, Inc.*, 2009 U.S. Dist. LEXIS 97472 (D. Pa. 2009)................................................................27

*First Penn-Pacific Life Insurance Co. v. Evans*, 313 Fed. Appx. 633 (4th Cir. 2009) ...............33

*Fountain v. United States*, 605 F. Supp. 2d 608 (D. Del. 2009) ....................................17

*General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296 (3d Cir. 2001) ......................17

*Jairett v. First Montauk Sec. Corp.*, 203 F.R.D. 181 (E.D. Pa. 2001) .........................................45

*Jung v. Nationwide Mutual Fire Insurance Co.*, 949 F. Supp. 353 (E.D. Pa. 1997) ..................24

*Kovac v. Pa. Turnpike Commission*, 2009 U.S. Dist. LEXIS 70408 (W.D. Pa. Aug. 11, 2009) ........................................................................................................17

*Life Product Clearing LLC v. Angel*, 530 F. Supp. 2d 646 (S.D.N.Y. 2008) ........................15, 35

*Lincoln National Life Insurance Co. v. Calhoun*, 596 F. Supp. 2d 882 (D.N.J. 2009)......4, 35, 36

*Lincoln National Life Insurance Co. v. Fishman*, 638 F. Supp. 2d 1170 (C.D. Cal. 2009).........33

*Luther v. Kia Motors America, Inc.*, 2009 U.S. Dist. LEXIS 117935 (D. Pa. 2009)...................27

*In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527 (D. Del. 1994)..................................19

*Markocki v. Old Republic National Title Insurance Co.*, 527 F. Supp. 2d 413 (D. Pa. 2007) ........................................................................................................50

*Maryland. National Bank v. Tower*, 374 F.2d 381 (4th Cir. 1967)............................................31

*McGeegan v. America General Assur. Co.*, 2004 U.S. Dist. LEXIS 23295 (E.D. Pa. 20004) .......................................................................................................21

*McMahon Brothers Realty Co. v. United States Fidelity & Guaranty Co.*, 217 F. Supp. 567 (D. Del. 1963) ...........................................................................................50, 51

*Michael v. Shiley, Inc.*, 46 F.3d 1316 (3d Cir. 1995) .................................................................20

*Mountbatten Surety Co. v. Brunswick Insurance Agency*, 2001 U.S. Dist. LEXIS 24224 (D. Pa. 2001) ..........................................................................................................50

*Mutual Reserve Fund Life Association v. Ferrenbach*, 144 F. 342 (8th Cir. 1906)....................43

*Narragansett Indian Tribe v. RIBO, Inc.*, 686 F. Supp. 48 (D.R.I. 1988)...................................41

*New York Life Insurance Co. v. Johnson*, 923 F.2d 279 (3d Cir. 1991) ......................................23

*O.S. De Braak, Ltd. v. Weymouth Equipment Corp.*, 1987 U.S. Dist. LEXIS 9966 (D. Del. 1987) ..................................................................................................................27

*Oglesby v. Penn Mutual Insurance Co.*, 877 F. Supp. 872 (D. Del. 1995) ....................21, 23, 26

*Orthovita, Inc. v. Erbe*, Civil Action No. 07-2395, 2008 U.S. Dist. LEXIS 11088 (E.D.Pa. Feb. 15, 2008)....................................................................................................54

*Owen J. Roberts School District v. HTE, Inc.*, Civil Action No. 02-7830 2003 U.S. Dist. LEXIS 2997 (E.D. Pa. Feb. 28, 2003) ...........................................................................54

*Partners Coffee Co., LLC v. Oceana Services and Products Co.*, C.A. No. 09-236, 2009 U.S. Dist. LEXIS 113209 (W.D. Pa. Dec. 4, 2009)...............................................54

*Philips v. County of Allgheny*, 515 F.3d 224 (3d Cir. 2008) ......................................................18

*Phoenix Life Insurance Co. v. LaSalle Bank N.A.*, 2009 U.S. Dist. LEXIS 26468 (E.D. Mich. 2009)...................................................................................................................36

*Ray v. United States*, 121 F.2d 416 (7th Cir. 1941) ...................................................................40

*Royal Indemnity Co. v. Pepper Hamilton LLP*, 479 F. Supp. 2d 419 (D. Del. 2007) .................17

*Rubin v. Posner*, 701 F. Supp. 1041 (D .Del 1988)....................................................................18

*Sands v. Wagner*, 314 Fed. Appx. 506, 508 (3d Cir. 2009) .......................................................53

*Schwartz v. U.S. Ins. Co.*, 21 Fed.Cas. 770, 772 (C.C.Pa. 1812) ...............................................40

*Secretary of State for Defence (U.K.) v. Trimble Navigation Ltd.*, 484 F.3d 700 (4th Cir. 2007) ..............................................................................................................................14

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984) ........................................................................................................................20

*Shenango Inc. v. Massey Coal Sales Co.*, Civil No. 08-199, 2009 U.S. Dist. LEXIS 82340 (W.D. Pa. Sept. 10, 2009) ......................................................................................53

*Stipcich v. Metropolitan Insurance Co.*, , 277 U.S. 311, 48 S. Ct. 512, 72 L. Ed. 895 (1928)..........................................................................................................................25

*Strawbridge v. New York Life Insurance Co.*, 504 F. Supp. 824 (D.N.J. 1980) .........................51

*Sun Life Assurance Co. of Canada v. Paulson*, 2008 U.S. Dist. LEXIS 11719 (D. Minn. Feb. 15, 2008) ...............................................................................................33, 34

*Sunburst Paper, LLC v. Keating Fiber International, Inc.*, C.A. No. 06-3959, 2006 U.S. Dist. LEXIS 78890 (E.D. Pa. Oct. 30, 2006) ......................................................53

*Toner v. Allstate Insurance Co.*, 829 F. Supp. 695 (D. Del. 1993) ............................................28

*U.S. ex rel. Paul E. Atkinson v. Pa. Shipbuilding Co.*, 2000 U.S. Dist. LEXIS 12081 (E.D. Pa. 2000)................................................................................................45

*Underhill Investment Corp. v. Fixed Income Discount Advisory Co.*, 319 Fed. Appx. 137 (3d Cir. 2009)....................................................................................................18

*United States v. Hawley*, 544 F. Supp. 2d 787 (N.D. Iowa 2008), *Summ. J. granted by, different results reached on Recons., in part, adhered to, in part by* 566 F. Supp. 2d 918 (N.D. Iowa 2008) ...........................................................................................51

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp*, 919 F.2d 206 (3d Cir. 1990)..............37

*Warnock v. Davis*, 104 U.S. 775 (1881) ..................................................................................6, 36

*Weber Display and Packaging v. Providence Washington Insurance Co.*, Civil Action No. 02-7792, 2003 U.S. Dist. LEXIS 2187 (E.D. Pa. Feb. 10, 2003) ................................54

## STATE CASES

*Abbott v. Gordon*, C.A. No. 04C-09-055, 2008 Del. Super. LEXIS 103 (Del. Super. Ct. 2008) ..........................................................................................................45

*Albertus v. Icoa Life Insurance Company*, 247 Or. 618 (1967) ....................................................43

*American Mutual Life Insurance Co. v. Mead*, 79 N.E. 526 (Ind. Ct. App. 1906) ....................41

*Arad v. Caduceus Self Insurance Fund, Inc.*, 585 So. 2d 1000 (Fla. Dist. Ct. App. 4th Dist. 1991)..........................................................................................................43

*Baltimore Life Insurance Co. v. Floyd*, 28 Del. 201, 91 A. 653 (1914)......................................29

*Bash v. Bell Telephone Co. of Pennsylvania*, 601 A.2d 825 (Pa. Super. 1992)..........................53

*Basile v. H & R Block*, 2001 PA Super. 136 (Pa. Super. Ct. 2001) ...........................................52

*Bosse v. Knights & Ladies of Sec.*, 220 S.W. 993 (Mo. Ct. App. 1920) .....................................40

*Brentwater Homes, Inc. v. Weibley*, 471 Pa. 17 (Pa. 1977) .......................................................28

939175.1

*Butler v. State Mutual Life Assur. Co.*, 8 N.Y.S. 411 (N.Y. Sup. Ct. 1890) ..............................32

*Christ v. Cormick*, 2007 WL. 2022053 (D. Del. July 10, 2007) ...........................................47. 48

*Columbian National Life Insurance Co. v. Mulkey*, 91 S.E. 106 (Ga. 1916)..............................40

*Dauphin Deposit Trust Co. v. World Mutual Health & Accident Insurance Co.*, 213 A.2d 116 (Pa. Super. Ct. 1965) ........................................................................................23

*eToll, Inc. v. Elias/Savion Adver.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) ...................................53

*Edelstein v. Carole House Apartments, Inc.*, 286  A.2d 658 (Pa. Super. 1971).........................28

*Edward G. Budd Building & Loan Association v. Kinsella*, 156 A. 577 (Pa. Super. Ct. 1931) ..................................................................................................................................40

*Elliott v. Knights of Modern Maccabees*, 46 Wash. 320 (1907) ..................................................41

*Endress v. Insurance Co.*, 1 Ohio Law Abs. 553 (Ohio Ct. App. 1923).......................................41

*Epps v. Pacific Insurance Co.*, 648 A.2d 424 (Del. 1994)...........................................................26

*Fleetboston Finance Corp. Fleet National Bank v. Advanta Corp.*, C.A. No. 16912, 2003 Del. Ch. LEXIS 8 (Del. Ch. Jan. 22, 2003) ...................................................53

*Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412 (1981) ..................................................................20

*Gibbons' Estate*, 200 A. 55 (Pa. 1938) ......................................................................................32

*Gibbs v. Ernst*, 538 Pa. 193 (Pa. 1994) .....................................................................................20

*Godina v. Oswald*, 206 Pa. Super. 51, 211 A.2d 91 (1965) .........................................................37

*Hall v. Jackson*, 788 A.2d 390 (Pa. Super., 2001) .....................................................................48

*Harco National Insurance Co. v. Green Farms, Inc.*, C.A. No. 1131, 1989 Del. Ch. LEXIS 114 (Del. Ch. Sept. 19, 1989)...........................................................................24

*Hellman v. National Council of Knights and Ladies of Sec.*, 200 S.W. 698 (Mo. Ct. App. 1918) ..................................................................................................................................42

*Hohenschutz v. Knights of Columbus*, 186 S.W.2d 177 (Ark. 1945)..........................................39

*Jardel Co. v. Hughes*, 523 A.2d 518 (Del. 1987)..................................................................47, 48

*Kaiser v. Insurance Co. of North America*, 117 A. 791 (Pa. 1922) ...........................................45

*Lewis v. Phoenix Mutual Life Insurance Co.*, 39 Conn. 100 (1872) ..........................................41

*Life Product Clearing LLC v. Angel*, 530 F.Supp.2d 646, 653 (S.D.N.Y. 2008) ............15, 35, 38

*Lincoln Life and Annuity Co. of New York v. Bernstein,* 24 Misc.3d 1211A (June 29, 2009) ................................................................................................................................15

*Littleton v. Young*, 1992 Del. LEXIS 15 (Del. Jan. 2, 1992)..................................................48, 49

*Lively v. Southern Heritage Insurance Co.*, 568 S.E.2d 98 (Ga. Ct. App. 2002) .......................24

*Lord v. Souder*, 748 A.2d 393 (Del. 2000).................................................................................20

*Marling v. Metropolitan Life Insurance Co.*, 1908 Ohio Misc. LEXIS 46 (Ohio Ct. C.P. 1908) ................................................................................................................................42

*McCaffrey v. Knights & Ladies of Columbia*, 213 Pa. 609 (Pa. 1906) .......................................23

*McClellan v. Health Maintenance Organization of Pennsylvania*, 413 Pa. Super. 128 (1992) ...............................................................................................................................48

*McDonald v. Northern Benefit Associate*, 131 P.2d 479 (Mont. 1942) ......................................40

*McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655 (Pa. Super. Ct. 2000)................................45

*Modern Woodmen of America v. International Trust Co.*, 136 P. 806 (Colo. App. Ct. 1913) ................................................................................................................................39

*NACCO Industrial v. Applica  Inc.*, 2009 Del. Ch. LEXIS 217 (Del. Ch. Dec. 22, 2009) ..........22

*National Counsel of Knights and Ladies of Security v. Garber*, 154 N.W. 512 (Minn. 1915) ................................................................................................................................40

*Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del.1987) ..........................................................................22

*Pacific Insruance Co. v. Higgins*, C.A. No. 11284, 1994 Del. Ch. LEXIS 36 (Del. Ch. Mar. 23, 1994) *aff'd mem* ...............................................................................................26

*Perlman v. Prudential Insurance Co. of America*, 686 So. 2d 1378 (Fl. Dist. Ct. App. 1997) ................................................................................................................................43

*Phoenix Life Insurance Co. v. Irwin Levenson Insurance Trust II and Jonathan Berck*, 2009 N.Y. Misc. LEXIS 2736 (Feb. 19, 2009)..................................................................15

*Porter v. Turner*, 954 A.2d 308 (Del. 2008) ............................................................47

*Rohm and Haas Co. v. Continental Casualty Co.*, 781 A.2d 1172 (Pa. 2001) ............................19

*Rose v. Bartle*, 871 F.2d 331, 336 (3d Cir. 1989) ......................................................46

*Rust v. Metropolitan Life Insurance Co.*, 36 Del. 294 (Del. 1934)........................................25

*Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957 (Del. 1980).......................50

*Shafer v. Join Hancock Mutual Life Insurance Co.*, 189 A.2d 234 (Pa. 1963)..........................26

*Shechter v. Shechter*, 75 A.2d 735 (Pa. 1950)..............................................................19

*Shoemaker v. Com. Bank*, 700 A.2d 1003 (Pa. Super. 1997)......................................................28

*Smith v. Ford*, 68 Pa. D. & C. 4th 432 (Pa. County Ct. 2004) ....................................................49

*Smith v. Keystone Insurance Co.*, C.A. No. 03C-06-037, 2005 Del. Super. LEXIS 102
(Del. Super. Ct. Mar. 22, 2005) ..............................................................................23

*Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236 (1976) ..............................................37

*Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del. 1991) ..............................................18

*Wender & Roberts, Inc. v. Wender*, 238 Ga. App. 355 (1999) ......................................43

*White v. George*, 66 Pa. D. & C. 4th 129 (Pa. County Ct. 2004)......................................48

*Wisniski v. Brown & Brown Ins. Co.*, 2006 PA Super. 216, P16 (Pa. Super. Ct. 2006) .............52

*Work v. American Mutual Life Insurance Co.*, 67 N.E. 458 (Ind. Ct. App. 1903)......................41

## DOCKETED CASES

*American General Life Insurance Co. v. Helene Klavans Insurance Trust, et al.*, no. 09-
cv-81449 ......................................................................................................14

*American General Life Ins. Co. v. Herbert Stone, et al.*, 09-cv-22718........................................14

*Kramer v. Lockwood Pension Services, Inc., et al.*, No. 08-2429 (S.D.N.Y.) ............................15

*PHI Variable Insurance Co. v. Alberto Rubio Family Insurance Trust and XLI Holdings
LLC*, C.D. Cal. Case No. 09-4652, filed June 26, 2009.......................................16

*Penn Mutual Insurance Co. v. Bernstein and LXI Holdings LLC*, D.N.J. Case No. 09-02833 ..................................................................................................................17

*Sun Life Assur. Co. of Canada v. XLI Holdings, LLC, et al.*, no. 09-cv-00407 ..........................14

*Sun Life Assurance Co. v. Thomas Laskaris, XLI Holdings LLC, and Frank Weisz*, D. Del. Case No. 09-413 ...........................................................................................16

*Sun Life Assurance Co. v. XLI Holdings LLC, First State Trustee Services LLC, Jack Bloch, and Frank Weisz*, D. Del. Case No. 09-407 ............................................16

*Sun Life Assurance Co. v. XLI Holdings LLC, Mark Lowell*, D. Del. Case No. 09-182..............16

## FEDERAL STATUTES

Fed.R.Civ.P. 8(a)(2) ....................................................................................................55

*Fed. R. Civ. P.* 12(b)(6) ........................................................................................1, 17

## STATE STATUTES

18 Del. C. § 2711) .....................................................................................................21

18 Del. C. § 2704(a) ............................................................................................30, 31

18 Del. C. § 7501 *et seq* .............................................................................................7

40 PA Stat. Ann. § 512............................................................................................29, 30, 31

40 PA Stat. Ann. § 626.1 *et seq*.................................................................................7

## MISCELLANEOUS

2 *Couch on Insurance* § 32:63 (3rd ed. 2007)............................................................43

5 *Williston on Contracts* §§ 1330, at 3737-38, 1460A, at 4085 (1937) ......................42

27 *Williston on Contracts*, § 69:51 (4th ed. 2000) ....................................................42

40 A.L.R.2d 1310 (West Group 2009)........................................................................38

*Appleman on Insurance § 174.03* ......................................................................23, 29

J. Alan Jensen and Stephan R. Leimberg, *Stranger-Owned Life Insurance: A Point/Counterpoint Discussion*, 33 ACTEC J. 110, 116 (Fall, 2007) .................5, 6

Westlaw 50 State Statutory Surveys 0110 SURVEYS 40 (West June 2009) ...............................7

## NATURE AND STAGE OF PROCEEDING

Defendants' motions to dismiss should be denied because the First Amended Complaint ("Amended Complaint") alleges ample facts to establish at least a reasonable expectation that discovery will lead to evidence proving each of the essential elements of each cause of action and request for relief asserted.  Therefore, each cause of action and claim for relief is *plausible,* rendering dismissal pursuant to *Fed. R. Civ. P.* 12(b)(6) inappropriate under the standard of review articulated by the United States Supreme Court in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

All of the claims in the Amended Complaint are rooted in a fraud scheme commonly known as Stranger-Originated Life Insurance ("STOLI").  Each of the defendants played a role in perpetrating fraudulent misrepresentations.  The objective was to obtain from American General Life Insurance Company ("American General") issuance of Life Policy UM0034959L (hereinafter "the Policy") insuring the life of Helen Goldstein ("Goldtsein") in the amount of $5 million to the Helen Goldstein Insurace Trust (the "Trust") as owner.  Goldstein was not financially qualified for the insurance, and the Trust lacked a valid insurable interest in the life of Goldstein at the time the Policy was issued.  The fraud was perpetrated, aided and abetted, and/or otherwise facilitated by each of the defendants to conceal Goldstein's lack of financial qualification for the Policy, the identity of the persons driving the transaction, the true reason for the Policy, and the Trust's lack of insurable interest in the Policy.  But for the fraud, American General would not have issued the Policy.

The nature and structure of the transactions underlying defendants' STOLI scheme and the fraud committed to cloak it render impossible direct proof or exhaustive recitation of all the facts underlying the fraud.  Nevertheless, the Amended Complaint sets forth detailed allegations

regarding the specific misrepresentations and concealment and each defendant's role in the scheme, generally.  These specific allegations, together with all reasonable inferences drawn from them, amply demonstrate the plausibility of each cause of action and claim for relief.  At a minimum, the factual allegations establish sufficient plausibility to warrant discovery.  The alternative, dismissal without an opportunity to develop further details of the fraud through discovery, would permit defendants to unjustly escape accountability for what is an obvious fraud upon American General.

## SUMMARY OF ARGUMENT

In order to carry out their illegal STOLI scheme, defendants intentionally misrepresented and concealed the truth about the reason why the Policy was sought and Goldstein's financial qualifications, including net worth and income.  The obvious objective of defendants' fraud was to circumvent American General underwriting guidelines and procedures, as well as the law concerning insurable interest, which in every state precludes strangers from purchasing or causing to be purchased life insurance insuring the life of another.   Although the very nature of the conduct alleged renders a complete account of the fraud impossible, the facts set forth in the Amended Complaint are sufficiently specific to give rise to reasonable expectation that discovery will uncover evidence establishing that the fraud occurred, that it was material to American General's decision to issue the Policy, and that each of the defendants participated to a greater or lesser extent.  Each of the defendants played a role in the perpetration and perpetuation of the fraud, and each must therefore answer for himself and for the others.

Defendants' fraud was carefully orchestrated to present an illusion of insurable interest through a sham trust.  However, the facts alleged in the Amended Complaint illustrate defendants' preexisting intent to transfer the Policy to stranger investors as of the time the Policy

was applied for and issued.  Defendants' insurable interest charade simply does not insulate them from the law of insurable interest.  Defendants' intent to transfer the Policy to strangers at the time the Policy was issued abrogates insurable interest.  The facts alleged give rise to at least a reasonable expectation that discovery will uncover evidence that the intent was shared by ultimate would-be investors when the Policy was issued, but even unilateral intent to transfer vitiates insurable interest.

The brashness of defendants' fraud warrants rescission and full restitution of American General to its status quo ante at the expense of defendants.  The remedy of rescission is an equitable one, requiring that the parties be restored to their pre-contract positions to the fullest extent possible.  Where complete restoration is impossible for both sides, the innocent party (American General in this case) should be restored at the expense of the fraudfeasors (defendants in this case).  Therefore, American General should be permitted to retain all or a portion of the premiums paid for the Policy in connection with its demand for rescission.  In any event, American General has constructively tendered refund in the Amended Complaint subject to its right to be restored.

The duplicity of defendants' conduct also warrants an award of punitive and exemplary damages to send a very clear and necessary message that this Court will not tolerate the same or similarly lawless schemes to go unchecked.  Each of the defendants, including Weisz, Weisz and Associates, Goldstein, and Berck violated their duties of good faith and forthrightness in completing the application for the Policy and presenting it to American General.  These duties are imposed as a matter of common law and societal expectations of moral conduct.

Perhaps most contemptible of all is the conduct of Weisz and Weisz and Associates as part of the fraud scheme.  Weisz's duties to American General were not limited to mere candor,

but by virtue of his status as an insurance producer, they rose to the level of utmost fidelity, which should have pervaded Weisz dealings with the Company. Weisz bore these duties as a matter of common law, and also subscribed to them by way of contract. Because of the trust and confidence placed in Weisz by American General by virtue of his position as an insurance producer, his conduct, and that of his firm, is particularly egregious and worthy of punishment.

## STATEMENT OF FACTS

### A.    Stranger-Originated Life Insurance (STOLI) Defined

Stranger-originated life insurance is a transaction "in which individuals are able to obtain third party financing to purchase a life insurance policy and to fund the premiums owed under that policy, with some understanding or expectation that the policy will be immediately assigned to an individual lacking an insurable interest, following the expiration of the policy's two-year contestability period." *Lincoln National Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 884 (D.N.J. 2009). STOLI transactions typically employ what appears to be a legitimate life insurance trust in order to conceal the true nature of the STOLI transaction. However, "[t]rusts that are created to give the appearance of insurable interest and are used to manufacture policies for investors are illegal STOLI schemes." NCOIL Life Settlements Model Act ("NCOIL Model"),[1] Drafting Note. Thus, STOLI transactions are, by definition, characterized by a lack of insurable interest, and are structured in a way to conceal the lack of insurable interest in order to circumvent insurable interest laws.[2]

---

[1] A copy of the NAIC Life Settlements Model Act and the Drafting Note can be viewed at http://www.insurereinsure.com/files/upload/2005368I.pdf.

[2] A STOLI transaction should not to be confused with a typical life settlement which has been defined by the Life Insurance Settlement Association (LISA) as "the sale of an existing life insurance policy for more than its cash surrender value but less than its net death benefit." http://www.thevoiceoftheindustry.com/content/13/What-is-a-Life-Settlement.aspx (January 7, 2010) (underline added).

939175.1

**B.     STOLI Transactions are Widely Recognized as a Substantial Threat to the Public at Large**

Life insurance generally is marketed and purchased as a form of protection against a loss of life that will have a financial impact upon one or more people in the insured's life, such as close family, a business partner or perhaps an employer.  The assumption is that the policy owner and beneficiaries have an interest in the continuation of the insured's life for reasons of love and affection or financial interdependence.  Life insurance is intended to replace income, not to create it.  Therefore, STOLI transactions, by definition, are anathema to the very concept of life insurance.  They are designed not to insure loved ones against the loss of life, but to allow strangers to profit from it.

STOLI poses a significant threat to the insurance-consuming public, especially seniors, who are targeted by STOLI promoters.  STOLI transactions have the potential of causing significant adverse tax consequences to unsuspecting insureds/applicants.  J. Alan Jensen and Stephan R. Leimberg, *Stranger-Owned Life Insurance: A Point/Counterpoint Discussion*, 33 ACTEC J. 110, 116 (Fall, 2007).  An insured's participation in a STOLI transaction may result in his/her inability to obtain other policies necessary for legitimate purposes, such as true tax and estate planning, due to exhaustion of age and income limits.  *Id.* at 115-116.  As in this case, the proposed insured typically, and perhaps unwittingly, provides written guarantees concerning the truth of representations made in the application for insurance and assumes a written obligation to repay consideration received from the investors and to defend/indemnify investors against damages and costs incurred, when the representations in the application turn out to be false.  *Id.* at 117; Appx. 37-41. Of course, the proposed insured also risks criminal and civil liability arising from such false representations, as well.  As in this case, the insured is typically required to

surrender privacy rights by authorizing the investors to obtain updates as to confidential health information.  *Id.* Finally, a proposed insured assumes increased risk of mortality.  Because the stranger-owner/investor typically is paying enormous premiums to keep the policy alive, he or she is taking a cynical but calculated gamble that the insured will die well before the amount of premiums paid begins to approach the amount of the death benefit. *Id*. at 117-118.  As stated in *Warnock v. Davis*, 104 U.S. 775, 779 (1881), without an insurable interest, "the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured.  Such policies have a tendency to create a desire for the event.  They are, therefore, independently of any statute on the subject, condemned, as being against public policy."

For these and other reasons, industry and regulatory organizations have strongly condemned the practice.  The Life Insurance Settlement Association ("LISA"), a trade organization representing the interests of the life settlements industry, has issued the following position statement: "The LISA is, and always has been, opposed to investor initiated life insurance transactions that are intended to circumvent insurable interest law."  J. Alan Jensen and Stephan R. Leimberg, *Stranger-Owned Life Insurance: A Point/Counterpoint Discussion*, 33 ACTEC J. 110, 124 (Fall, 2007).[3]  The Association for Life Underwriting (AALU), the National Association of Life Underwriters (NAIFA) and the American Council of Life Insurers (ACLI) are also unified in their condemnation of STOLI.[4]  The National Association of Insurance

---

[3] *See also*
www.thevoiceoftheindustry.com/files/news/docs/lisanews_1st_edition_of_The_Voice_of_the_Industry.pdf

[4] *See STOLI: The Problem and the Appropriate State Response*
(http://www.naifa.org/advocacy/stolialert/pdf/STOLI_primer.pdf).

939175.1

Commissioners (NAIC) and the National Conference of Insurance Legislators (NCOIL) have each proposed Model Acts[5] intended to prevent the practice and protect consumers.

According to NCOIL, "[i]t is an essential public policy objective to protect consumers against stranger-originated life insurance (STOLI )."[6] Legislation similar to the NAIC and/or NCOIL models has been adopted in 47 states.[7] Delaware and Pennsylvania are among them.[8]

### C.    The Policy at Issue Here Was Manufactured as Part of an Illegal STOLI Scheme.

Goldstein had no interest in purchasing insurance from American General (or any other company) for any legitimate purpose during the relevant time period.  Rather, Goldstein became involved in the transaction following a telephone call from an unidentified friend who told Goldstein about a fast-money scheme and called it a "fabulous deal."  Appx. 004 at ¶ 10.  According to her friend, all Goldstein had to do was submit to a medical examination and apply for an insurance policy, which would be immediately sold upon issuance, and she would receive a six-figure cash payment.  *Id.*  Goldstein's friend referred her to Rose Marie "Rosie" Soto, Esq., an attorney with defendant Frank B. Weisz and Associates, P.C. ("Weisz and Associates") located in Plymouth Meeting, PA, less than fifteen miles from Goldstein's home in Wynnewood, Pennsylvania.  *Id.*

Goldstein underwent a physical examination at Radnor Family Practice in Radnor, Pennsylvania, and was told that she was eligible to apply for and sell the Policy at issue.  Appx.

---

[5] The NCOIL Model Act can be viewed at http://www.insurereinsure.com/files/upload/2005368I.pdf. The NAIC Model Act can be viewed in the Westlaw database NAIC-MODLRG at NAIC 697-1.

[6] NCOIL Model Act, Drafting Note.

[7] Westlaw 50 State Statutory Surveys 0110 SURVEYS 40 (West June 2009)

[8] 18 Del. C. § 7501 *et seq.*;  40 PA Stat. Ann. § 626.1 *et seq.*

7 939175.1

02 at ¶ 4.  Soto completed the application forms on behalf of Goldstein, including the Part A Life

Insurance Application ("Application Part A") and Part B Life Insurance Application

Pennsylvania Version ("Application Part B"), which Goldstein, Berck, and Weisz then executed

and dated March 14, 2007.  Appx. 004 at ¶ 11; Appx. 10-15, Appl. Part A; Appx. 12-25, Appl.

Part B.  The Application Part B indicates that it was executed in Radnor, Pennsylvania, while the

Application Part A purports to have been executed in Wilmington, Delaware on the same date.

Goldstein, Berck, and Weisz also completed and executed a Financial Questionnaire in further

support of their Application for the Policy, on or about April 4, 2007.[9]

In order to facilitate transfer of the Policy and conceal the true ultimate beneficiaries,

defendants designated the Trust as the proposed owner in Application Part A, and indicated that

the reason for the Policy was "estate planning."   Meanwhile, some or all of the defendants also

established the Trust by agreement dated March 13, 2007, which identified Jonathan Berck as its

Trustee.  XLI Ex. A, Helen Goldstein Ins. Tr. Agr.  On the same date that the Trust agreement

was executed, Berck executed a Certificate of Beneficial Ownership Interest in the Trust, which

certified that "Stanford Goldstein is the registered holder of the sole nonassessable, fully-paid,

Beneficial Interest" in the Trust.   Appx. 26-28, Cert. of Ben. Ownership Int.  Stanford Goldstein

("Stanford") is Goldstein's husband.  According to Goldstein's daughter, Stanford historically

handled all of the family's business affairs, but he has been suffering from dementia; as a result,

he has been unable to tend to the family's business, and was not involved in this transaction.

Appx. 003 at ¶ 7.

---

[9] The Application Part A and Financial Questionnaire both purport to have been executed in Wilmington, Delaware.
However, the circumstances surrounding Goldstein's referral to Weisz and Associates, including Goldstein's
residence, the location of Weisz' office and execution of the original Application Part B in Plymouth meeting, all
indicate that the Application Part A and Financial Questionnaire, like the Application Part B, were also likely
executed in Pennsylvania.

939175.1

American General issued the Policy to the Trust, as owner, on May 24, 2007 without knowledge of Goldstein's true intentions for the Policy or the lack of insurable interest.  Am. Compl., ¶ 47.  It was delivered to Berck on June 5, 2007.  Appx. 29-30, Acknowl. of Pol. Del. By letter dated June 11, 2007 addressed to Stanford, Lori Callegari, Vice President of Investments at Tall Tree Advisors, Inc. ("Tall Tree"),[10] revealed her "understanding that [Stanford was] the sole beneficiary of the Helen Goldstein Insurance Trust" and that "such Trust owns a $5 million life insurance policy on the life of Helen Goldstein issued by American General Life Insurance Company."  Appx. 31-26, 6/11/07 Letter.  Ms. Callegari offered to purchase Stanford's interest in the Trust for $100,000.  *Id*.  The letter enclosed a proposed Beneficial Interest Transfer Agreement for the Goldsteins' consideration.  *Id*.

One day later, Ms. Callegari sent Stanford a letter (dated June 12, 2007) in which she acknowledged receipt of the executed Beneficial Interest Transfer Agreement and an Acknowledgments and Consent Form, and enclosed Tall Tree Advisors' check for $113,975 representing compensation for transfer of the beneficial interest in the Trust and reimbursement of premium payments advanced by Goldstein for the Policy.  Appx. 37-41, 6/12/07 Letter.

Thereafter, on June 21, 2007, Berck sent a check to American General in the amount of $153,725 representing the balance of the initial premium due for the Policy, which was required to put the Policy in force.  Appx. 42-44, Check.  Following receipt of the check by American General on June 25, 2007, American General put the Policy in force as of June 26, 2007.  Appx. 45-95, AWD Notes.

---

[10] Tall Tree Advisors, Inc.'s address is noted in the correspondence as 75 Rockefeller Plaza Suite 2103, New York, New York.  Lockwood Pension Services, Inc. also does business at that address.  Appx. 320-324.  Lockwood Pension Services is a member of XLI.  Am. Compl. ¶ 16.  Therefore, Tall Tree appears to be closely connected to XLI.

On July 6, 2007, Ms. Callegari executed another Beneficial Interest Transfer Agreement, this time transferring the beneficial interest in the Trust, and therefore the Policy, from Tall Tree Advisors to XLI in exchange for payment of $267,700.  Appx. 96-100, Ben. Int. Trans. Agr.  The Trustee later changed the ownership of the Policy from the Trust to XLI.  Appx. 101-102, Change Form.  XLI then named itself as beneficiary of the Policy.  Appx. 103-104, Change Form.

> **D.      Defendants Intentionally Misrepresented Goldstein's Income and Net Worth  and Reason for the Policy and Concealed Their Intention to Transfer the Policy to Third Parties for Profit.**

Question 1 of the Application Part A asked for Goldstein's annual income and net worth.  In response to Question 1, Goldstein, Berck, Weisz and the Trust represented that Goldstein had annual household income of $200,000 and a net worth of $5.5 to $6 million.  Appx. 10-15, Application Part A.  The Financial Questionnaire also requested a statement of Goldstein's personal pre-tax income from all sources and approximate net worth.  Appx. 105-107, Financial Questionnaire.  Here, again, Goldstein, Berck, the Trust, and Weisz represented Goldstein's personal pre-tax income as $200,000 for the current fiscal year (2007), comprised of unearned income from "interest, dividends, and net real estate income,"  and approximate net worth as $5.5 to $6 million.  *Id.*

Goldstein objected to the income and net worth values inserted into the forms by Soto as being inflated.  Appx. 004 at ¶ 11.  However, Soto assured her that the numbers constituted a good faith "estimate" of Goldstein's income and net worth, and that the representations were completely "above board."  *Id.*

Despite American General's investigation whereby it attempted to verify the representations concerning Goldstein's income and net worth, American General has been unable to verify Goldstein's personal net worth or income as stated in the Application Part A and the Financial Questionnaire.  Am. Compl., ¶¶ 56-58.  Specifically, American General has been unable to verify Goldstein's interest in or ownership of any real estate other than the home in which she lives.  Thus, the "estimates" were obviously neither made in "good faith" nor "above board."

Defendants also misrepresented the reason for the insurance.  In response to Question 3.B. on the Application Part A, Goldstein, Berck, Weisz, and the Trust identified the proposed owner of the Policy as the Trust, and in response to Question 4, Goldstein, Berck, Weisz and the Trust represented that the reason for the Policy was "Estate Planning."   Appx. 10-15, Application Part A.  In the insurance context "estate planning" refers to preservation of a purportedly sizeable estate from estate taxes.[11]  However, at all times during the application for, issuance, delivery and transfer of the Policy, Goldstein and the other defendants intended and understood that Goldstein was applying for the Policy for the sole purpose of immediately selling it for cash, not for estate planning purposes.  Appx. 002-003 at ¶ 6.

Far from engaging in legitimate estate planning, Goldstein claims that she never even knew that a trust would be or had been established in her name.  Appx. 005 at ¶ 5.  In fact, according to Goldstein's daughter, Goldstein has always had a philosophical aversion to trusts in general, and always refused to create one.  *Id.*  Moreover, it was Goldstein's understanding that

---

[11]  In the context of life insurance issued on the lives of seniors, "estate planning" clearly refers to estate tax planning.  The following explanation appears under "estate planning" on the Wikipedia.com website,: "**Tax.** Because the United States tax code does not tax life insurance proceeds as income, a life insurance trust could be used to pay estate taxes. However, if the decedent holds any incidents of ownership like the ability to remove or change beneficiary, the proceeds will remain in his estate. For this reason, the trust vehicle is used to own the life insurance policy and it must be irrevocable to avoid inclusion in the estate." http://en.wikipedia.org/wiki/Estate_planning (July 23, 2009).

11  939175.1

neither she nor any of her children nor any other person with an insurable interest in her life engendered by love or affection or otherwise had any interest in the Policy.  *Id.*

After submitting the application to American General, defendants perpetuated the fraud concerning Goldstein's net worth and the reason for the Policy with more lies about how Goldstein intended to fund the Trust.  American General discovered during its review of the Application that Goldstein had an Adjusted Income of just $89,604 in 2006 including $22,534 in Social Security benefits.  Am. Compl., ¶¶ 44-46.  Consequently, American General inquired as to Goldstein's ability to fund the Trust to pay the premiums on the Policy.  *Id.*  In response, Weisz, Soto and Thomas Shea, Esq., all attorneys associated with Weisz and Associates, claimed that Weisz and Associates represented Goldstein in connection with her estate planning, and that Goldstein planned to liquidate her investment assets and move those assets into the Trust in order to pay premiums on the Policy.  Appx. 108-109, 4/2/07 Soto Email; Appx. 110-111, 4/2/07 Shea Letter; Appx. 112-113, 4/23/07 Shea Letter; Appx. 114-116, 5/21/07 Weisz Email.

However, Goldstein did not liquidate any of her investment assets to pay for premiums on the Policy or fund the Trust as represented by defendants.  In fact, Goldstein claims that she did not expect to pay, and did not pay, any of the premiums due for the Policy. Appx. 002 at ¶ 5. Instead, less than six days after the Policy was delivered to the Trustee, Berck, the beneficial interest in the Trust held by Stanford was sold to Tall Tree in exchange for payment by check in the amount of $113,975.  On July 6, 2007, Tall Tree sold its beneficial interest in the Trust to XLI in exchange for payment of $267,700.   Following the July 6, 2007 transaction, XLI became the sole beneficiary of the trust and the sole premium payor for the Policy.

**E.      Defendants Certified that All of the Information Provided to American General Was True and Complete in Order to Induce**

**American General to Rely Upon Their Representations and Issue the Policy**

By executing the Application, Goldstein, Berck, the Trust, and Weisz acknowledged and agreed that American General would rely upon the information provided in the Application when determining whether to issue the Policy, and Goldstein, Berck, the Trust, and Weisz promised that the information in the Application, was true and complete as follows:  "[The statements contained in this application and any attachments] are true and complete to the best of my knowledge and belief.  I understand that this application: (1) will consist of Part A, Part B, and if applicable, related attachments including supplement(s) and addendum(s); and (2) shall be the basis for any policy and any rider(s) issued."  Appx. 10-15, Application Part A.

Weisz completed and executed an Agent Certification Form on August 22, 2007 in which he fraudulently represented to American General that:

> 1)   I have reviewed and am familiar with all aspects of the premium financing proposal.
>
> 2)  Based upon my review of the financing proposal I believe that the costs associated with this premium financing proposal are such that assuming no change in the insured's health it is more likely than not that the insured will maintain the policy in force for the benefit of his/her beneficiaries and those beneficiaries will receive more than 50% of the policy death benefit.
>
> 3)  The insured is not receiving cash payment, borrowing funds in excess of those required to pay the scheduled premiums and interest or receiving any other consideration as an inducement to participate in this transaction.
>
> 4)  There is no prearranged agreement to transfer the policy nor will the policyholder have a prearranged option or right of first refusal to transfer the policy to a third party.
>
> ***
>
> 6)  I have read the Field Bulletins regarding Investor Owned Life Insurance, Stranger Owned Life Insurance and Viatical Transactions, and I believe this transaction is in compliance with the company policies as set forth in those Bulletins regardless of

939175.1

whether the lending program is a recourse or non-recourse transaction.

Appx. 117-119, Agent Cert.  Weisz also completed and executed an Agent's Report on March 14, 2007.  In the Agent's Report, Weisz represented to American General that he was not "aware of any information that would adversely affect any proposed insured's eligibility, acceptability, or insurability."  Appx. 120-121, Agent Report.

> ### F.   Laskaris, Weisz and Weisz's Associates Have Been Engaged in a Pattern and Practice of Illegal STOLI Transactions.

Many other actions have been filed alleging STOLI schemes against these defendants, some resulting in citable orders and opinions, and some not.  The court may take judicial notice of similar actions brought against various of the defendants in which the same *modus operandi* is alleged, if not for the truth of the allegations stated therein, then for their existence.  *See Anspach v. City of Philadelphia,* 503 F.3d 256, 273 n.11 (3d Cir. 2007); *Secretary of State for Defence (U.K.) v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007).

Laskaris is the primary trustee in at least two other STOLI transactions perpetrated against American General and at least one perpetrated against other insurers. Specifically, Laskaris also serves as the Trustee in connection with STOLI transactions made the subject of two pending lawsuits commenced by American General in the Southern District of Florida: *American General Life Ins. Co. v. Helene Klavans Insurance Trust,et al.*, no. 09-cv-81449 and *American General Life Ins. Co. v. Herbert Stone, et al.*, 09-cv-22718.  Appx. 122-156, Klavans Complaint; Appx. 157-186, Stone Complaint.  He was also the successor trustee to Berck in another STOLI transaction perpetrated against Sun Life Assurance Company, which is the subject of *Sun Life Assur. Co. of Canada v. XLI Holdings, LLC, et al.*, no. 09-cv-00407, pending

14 939175.1

before this Court.  Appx. 187-212, Answer, Defenses and Counterclaims of Defendants XLI

Holdings, LLC, at p. 19.

Laskaris' involvement in the present STOLI scheme became evident on January 10, 2008

when Berck resigned as Trustee and appointed Laskaris as his successor.  On March 11, 2009,

Laskaris and a representative of XLI executed a Change of Ownership form, requesting a change

in ownership of the Policy from the Trust to XLI.  Am. Compl. ¶ 53.  On March 12, 2009, a

representative of XLI executed a Change of Beneficiary Form designating XLI as the primary

beneficiary of the Policy.  *Id.*  However, the ubiquity of his STOLI trustee experience suggests

that he was a participant in this case from its inception or came to the matter as a facilitator with

eyes wide open to the fraud that had already occurred and was still being perpetuated.

Berck was the original Trustee of the Trust.  Berck may have been a stranger to

Goldstein, but he is no stranger to these STOLI transactions.  Other cases involving Berck and

alleging similar transactions are *Lincoln Life and Annuity Co. of New York v Bernstein,* 24

Misc.3d 1211A (June 29, 2009) (premiums in excess of $1 million on STOLI policy were paid

by Berck); *Kramer v. Lockwood Pension Services, Inc., et al.,* No. 08-2429 (S.D.N.Y.)

(addressing alleged STOLI scheme involving Berck and Tall Tree Advisors); and *Phoenix Life

Insurance Co. v. Irwin Levenson Insurance Trust II and Jonathan Berck,* 2009 N.Y. Misc.

LEXIS 2736 (Feb. 19, 2009).  In fact, the court in *Levenson* described Berck as being

"experienced with multiple iterations of virtually identical trusts and transactions" and as having

"participated in multiple multimillion dollar life insurance transactions."  Berck also was the

trustee of the life insurance trust involved in the STOLI scheme described in *Life Product

Clearing LLC v. Angel*, 530 F.Supp.2d 646, 653 (S.D.N.Y. 2008).  With regard to that

transaction, the court observed, "The law prohibits gaming the system to procure wager policies, regardless of the creativity of form." *Id.* at 656 (citation omitted).

Weisz is also a prolific STOLI player.  He was also involved in the STOLI scheme against Sun Life referenced above.  Appx. 213-229, Compl. for Decl. Judgment, ¶ 2.  His associates, Shea and Soto also took part in that scheme.  Appx. 213-229 at ¶¶ 27, 35, and 37.

A search of the federal dockets reveals, for example, the following actions alleging STOLI schemes against one or more of the defendants or players in the present lawsuit, i.e., XLI, Weisz, Highland Capital, Berck, Laskaris, and/or Tall Tree Advisors.  Each transaction is alleged to have involved an elderly proposed insured, material misrepresentations in the application concerning income and/or purpose of insurance, the use of trusts to effect the transfer of ownership, multimillion-dollar policy face amounts, and a beneficial interest and payment or reimbursement of premiums by XLI or another entity that had no relationship to the insured:

- *Sun Life Assurance Co. v. XLI Holdings LLC, First State Trustee Services LLC, Jack Bloch, and Frank Weisz,* D. Del. Case No. 09-407 GMS, filed June 3, 2009 (involving $15 million in insurance on life of elderly man solicited by Weisz, in which beneficial interest was held by a trust created by Berck and funding was provided by XLI, to which the beneficial interest initially held by someone related to the insured was transferred);

- *Sun Life Assurance Co. v. Thomas Laskaris, XLI Holdings LLC, and Frank Weisz,* D. Del. Case No. 09-413 GMS (filed September 28, 2009; amended complaint filed 10/6/09) (involving $20 million in insurance on life of elderly woman solicited by Weisz through Highland Capital Brokerage.  Beneficial interest was sold to Tall Tree, which in turn sold it to XLI.  After the initial premium check, subsequent checks were signed by Berck, trustee of the insurance trust.  Laskaris was successor trustee);

- *Sun Life Assurance Co. v. XLI Holdings LLC, Mark Lowell,* D. Del. Case No. 09-182 HB, filed March 18, 2009 (seeking rescission of $4 million policy transferred to and funded by XLI pursuant to sale made *before* the policy was even issued);

- *PHI Variable Insurance Co. v. Alberto Rubio Family Insurance Trust and XLI Holdings LLC*, C.D. Cal. Case No. 09-4652, filed June 26, 2009 (involving $10 million in life insurance as to which beneficial interest was sold to XLI one day after policy was delivered);

- *Penn Mutual Insurance Co. v. Bernstein and LXI Holdings LLC,* D.N.J. Case No. 09-02833 JBS, filed June 11, 2009 (involving $8 million in coverage on life of 77-year-old man.  Trust was created two days before application. Two weeks later, wife's beneficial interest in trust was transferred to XLI, with bulk of premiums paid from an address associated with Berck).

All of these cases may be found in the federal court's PACER system.  The operative versions of the complaints in the cases described above are attached as Appendix pages 230-319.  Presumably many others have been filed in state courts, as suggested in some of the cited cases.

## LEGAL ARGUMENT

### I.  AMERICAN GENERAL HAS PLEADED FACTS SUFFICIENT TO ESTABLISH THAT EACH CAUSE OF ACTION IS PLAUSIBLE

Rule 12(b)(6) requires the Court to construe the Amended Complaint in the light most favorable to American General, and deny the motion to dismiss unless it appears to a certainty that American General would not be entitled to relief under *any* plausible state of facts that could be proved in support of its claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  All well-pleaded facts contained in the Compliant must be accepted as true for the purpose of the motion, and plaintiff shall be given the benefit of every favorable inference that can be drawn from those allegations.  *General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 325 (3d Cir. 2001); *Royal Indem. Co. v. Pepper Hamilton LLP*, 479 F. Supp. 2d 419, 425 (D. Del. 2007).  Moreover, Rule 12(B)(6) must be read in conjunction with Rule 8, which requires only that a valid complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief, not "detailed factual allegations." *Kovac v. Pa. Tpk. Comm'n* 2009 U.S. Dist. LEXIS 70408, 5-6 (W.D. Pa. Aug. 11, 2009); *Fountain v. United States*, 605 F. Supp. 2d 608, 611 (D. Del. 2009).  Thus, to survive a motion to

17 939175.1

dismiss, the complaint must simply state a claim to relief that is plausible on its face.  *Brookins v. Red Clay Consol. Sch.*, 2009 U.S. Dist. LEXIS 115459, 3 (D. Del. Dec. 11, 2009).

A claim is plausible if the complaint contains enough factual matter, accepted as true, to suggest the claim's required element.  *Biggins v. Markell*, 2009 U.S. Dist. LEXIS 89213, 6 (D. Del. Sept. 25, 2009).  Requiring a claim to be "plausible" does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.  *Id*. at 6-7.  Indeed, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  *Philips v. County of Allgheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Rubin v. Posner,* 701 F. Supp. 1041, 1045 (D .Del 1988).

As more fully set forth below, American General has pleaded facts sufficient to establish that the claims asserted are – at an absolute minimum – plausible under the laws of both Delaware and Pennsylvania. [12]  However, even if the Amended Complaint is technically deficient in any respect, it should not be dismissed; rather, American General should be required to submit a more specific statement of facts or granted leave to file a second amended complaint.

---

[12]     American General requests that the choice of law analysis be deferred until further facts relevant to Delaware's "most significant relationship" test are developed through discovery.  Factors contributing to the significance of the state's relationship to the action include the place of contracting and negotiating the contract, as well as place of performance, subject matter, incorporation and business of the parties.  *See Underhill Investment Corp. v. Fixed Income Discount Advisory Co.,* 319 Fed. Appx. 137 (3d Cir. 2009) (applying Delaware choice of law analysis); *Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del. 1991).  Some of these facts, such as the state in which the application for insurance and the insurance trust actually were signed, await confirmation through discovery.

## II.    THE AMENDED COMPLAINT ESTABLISHES A REASONABLE EXPECTATION THAT DISCOVERY WILL REVEAL EVIDENCE OF EACH DEFENDANT'S FRAUD

The allegations in the First Amended Complaint, taken as true, establish that defendants have committed intentional fraud in the procurement of the Policy.  Specifically, defendants misrepresented and failed to disclose the true reason for purchasing the Policy and Goldstein's true net worth and income in order to obtain the Policy for the benefit of complete strangers with no insurable interest in the life of Goldstein.  The misrepresentations were committed in order to circumvent statutory law and public policy concerning insurable interest, as well as American General's underwriting guidelines, which would not have permitted issuance of the Policy. Although the very nature of the conduct alleged renders a complete account of the fraud impossible, the facts set forth in the Amended Complaint are sufficiently specific to give rise to reasonable expectation that discovery will uncover evidence establishing that the fraud occurred and that all defendants participated in this scheme.

As in most cases of fraud, defendants' fraud in this case was not "proclaimed from the housetops nor [was] it done otherwise than surreptitiously with every effort usually made to conceal the truth of what is being done." *Rohm and Haas Co. v. Continental Casualty Co.,* 781 A.2d 1172 (Pa. 2001), quoting *Shechter v. Shechter,* 75 A.2d 735, 755 (Pa. 1950)(emphasis added).  Fraud can rarely be shown by direct proof and must necessarily be largely inferred from the surrounding circumstances.  Accordingly, the particularity requirement of Rule 9 for pleading fraud does not necessitate an exhaustive recitation of facts, but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes a wrong has occurred.  *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 555 (D. Del. 1994).  It is too narrow an approach to focus on the "particularity" language of the Rule as to do

so would disregard the general simplicity and flexibility contemplated by the federal rules. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). In addition, courts must be sensitive to the fact that overzealous application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud and unjustly escape liability. *Christidis v. First Pennsylvania Mortg., Trust*, 717 F.2d 96, 100 (3d Cir. Pa. 1983); *see also, End of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 198 (D. Del. 2000).

A claim for fraudulent misrepresentation in either Delaware or Pennsylvania generally requires allegations of: (1) a false representation, (2) made with knowledge of its falsity or recklessness as to whether it is true or false, (3) which is intended to make the receiver act, (4) justifiable reliance on the misrepresentation, and (5) damages to the receiver as a proximate result of the reliance. *Lord v. Souder,* 748 A.2d 393, 402 (Del. 2000); *Gibbs v. Ernst*, 538 Pa. 193, 207 (Pa. 1994). Fraud is broadly defined as "anything calculated to deceive, whether by single act or combination, …, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Frowen v. Blank*, 493 Pa. 137, 143, 425 A.2d 412, 415 (1981). *See also Michael v. Shiley, Inc.*, 46 F.3d 1316, 1334 (3d Cir. 1995) (finding sufficient evidence of fraud where the record showed a pattern of affirmative statements contrary to the true information known to defendant/appellee medical device manufacturer which, when combined with withholding of certain material information, could permit a jury to conclude the device manufacturer misrepresented its product's performance and the importance of the device's defect).

Misrepresentation or concealment in an application for insurance also allows the insurer to rescind the policy where the misrepresentation or concealment was either fraudulent, <u>or</u>

material either to the acceptance of the risk or to the hazard assumed by the insurer; <u>or</u> the insurer in good faith would either not have issued the policy or contract at all or with the same terms.  *Oglesby v. Penn Mutual Ins. Co.*, 877 F.Supp. 872 (D. Del. 1995) (*quoting*, 18 Del. Code. Ann. § 2711) (emphasis added).  In Pennsylvania, rescission is permitted where (1) the representation was false, (2) the misrepresentation was material to the risk being insured, and (3) the insured knew that the representation was false when made or made the representation in bad faith.  *McGeegan v. Am. Gen. Assur. Co.*, 2004 U.S. Dist. LEXIS 23295 (E.D. Pa. 20004).

American General seeks, together or in the alternative, rescission of the Policy based upon fraud in the application and an award of damages as against all defendants on account of the fraud in the application and outside of the application.  The facts alleged in the Amended Complaint, together with the reasonable inferences to be drawn from the facts, are more than sufficient to establish a reasonable expectation that discovery will reveal evidence proving each defendant's fraud.

### A.  Each of the Defendants, Including Laskaris and XLI, Participated in the Fraud.

The Amended Complaint alleges that defendants misrepresented the true reason for purchasing the Policy, Goldstein's true net worth and Goldstein's intention to pay premiums. Defendants also attempted to conceal the true ultimate beneficiary of the Policy in furtherance of the plan to manufacture the Policy in order to be securitized and sold.  The representations were obviously calculated to deceive, affirmatively and through the suppression of truth, in order to induce American General to issue a policy that it otherwise would not have agreed to issue.

The breadth of conduct potentially giving rise to fraud under the law encompasses Laskaris' and XLI's conduct subsequent to the issuance of the policy because their conduct, in

939175.1

combination with the misrepresentations and omissions of Goldstein, Weisz, Weisz and

Associates, Berck, and the Trust in the procurement of the Policy, completed defendants'

fraudulent scheme.  Without Laskaris' and XLI's ultimate participation, the transaction could not

have been consummated.  Laskaris' and XLI's role and participation in the fraudulent scheme is

evidenced by the rapid succession of events following issuance of the Policy in which Laskaris

and XLI actively participated, including the offer to and acceptance of sale by ostensibly

Stanford of the beneficial interest in the trust, Laskaris' substitution as trustee, and the change in

ownership of the Policy.

Obviously, Weisz, Berck, and the Trust would not have, nor could they have, initiated the

transaction with Goldstein and paid the substantial premiums necessary to obtain the Policy

without a promise of purchase.  The temporal proximity of the sale of the beneficial interest in

the Policy to XLI through Tall Tree Advisors renders the existence of just such a prior

arrangement much more likely than not.  Stanford received an offer to purchase his beneficial

interest in the Policy by letter dated June 11, just six days after the Policy was delivered to

Berck.  The offer came from Tall Tree Advisors, a company apparently related to XLI.  Before

the ink was dry on that letter (perhaps before he even received the letter), Stanford apparently

executed the transfer agreement, and received payment for the transfer under cover of letter

dated the next day, June 12.  Less than a month later, on July 6, the beneficial interest was

transferred from Tall Tree to XLI itself.   Laskaris became trustee shortly thereafter.  Thus,

Laskaris and XLI both participated in fulfilling the ultimate purpose of the Trust; to conceal and

facilitate the transfer of the Policy to XLI.  Individuals acting collectively to commit fraud are

held jointly and severally liable for the acts of cohorts committed in furtherance of the collective

action. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del.1987); *see also NACCO Indus. v. Applica*

*Inc.*, 2009 Del. Ch. LEXIS 217 (Del. Ch. Dec. 22, 2009) (holding that defendant could be liable for fraud where defendant facilitated and assisted the co-conspirator's fraud).

The ubiquitousness of nearly all of the defendants, including Laskaris, in the STOLI arena at all stages of transactions, as evidenced by their participation in numerous legal actions, renders discovery of evidence establishing their direct participation in the present transaction all the more likely.  Weisz has participated in at least three STOLI transactions of which we are aware.  Shea and Soto have been implicated in at least two.  XLI has participated in at least six. Tall Tree Advisors has participated in at least two.  Laskaris has served as trustee in at least four. Berck has participated in at least five.

## B.    The Misrepresentations Were Material

 "It is hornbook law that where the insurer seeks a specific answer, the fact elicited will usually be treated as a material one." *Oglesby v. Penn Mut. Life Ins. Co.*, 877 F. Supp. 872, 894 (D. Del. 1995) (*citing* 12 A *Appleman* at § 7295 (citations omitted)) *see also Dauphin Deposit Trust Co. v. World Mut. Health & Accident Ins. Co.*, 213 A.2d 116, 118 (Pa. Super. Ct. 1965) ("An application is an integral part of a policy, and the questions and answers contained therein are material to the risks which both the company and the insured assume").  "[A] misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."  *Smith v. Keystone Ins. Co.,* C.A. No. 03C-06-037, 2005 Del. Super. LEXIS 102, *9 (Del. Super. Ct. Mar. 22, 2005).  A misrepresented fact is material if, "being disclosed to the insurer, it would have caused it to refuse the risk altogether, or to demand a higher premium."  *New York Life Ins. Co. v. Johnson*, 923 F.2d 279, 282 (3d Cir. 1991) (*citing McCaffrey v. Knights & Ladies of Columbia*, 213 Pa. 609, 612 (Pa. 1906)).  American General's application specifically requested

Goldstein's net worth and income and Goldstein's purpose in obtaining the Policy. Misrepresentations in response to these questions are undisputedly material. *See e.g., Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1335 (11th Cir. Ga. 2009) (misrepresentations in response to questions regarding net worth and income on an application for life insurance are material).[13]   Thus, defendants' misrepresentations in response to questions posed on the application relating to income, net worth, and reason for the insurance are material as a matter of law.  The same is true for such misrepresentations made by defendants outside of the application attached to the Policy.

Even if the misrepresentations were not material as a matter of law, their materiality would be a mixed question of fact and law for the jury.  *Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F. Supp. 353, 357 (E.D. Pa. 1997); *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, C.A. No. 1131, 1989 Del. Ch. LEXIS 114 (Del. Ch. Sept. 19, 1989).  As such, materiality is not an appropriate issue for resolution at the pleading stage.

Moreover, the application in this case expressly stated that American General would rely upon the information provided in the Application when determining to issue the Policy. Goldstein, Berk, the Trust and Weisz acknowledged, agreed, and affirmed that American General would rely on the information in the Application.  Thus, defendants assented to the materiality of all information in the Application and cannot now attempt to disclaim materiality.

Misrepresentations made by defendants outside of the application concerning income, net worth and reason for the insurance were also material.  The fact that American General sought and obtained certain information from Weisz in the Agent Statement and Agent Certification

---

[13]Georgia law regarding materiality of misrepresentations is substantially similar to Pennsylvania and Delaware law. A material misrepresentation is one that would influence an insurer in determining whether or not to accept a risk, or in fixing the amount of premium upon acceptance.  *Lively v. Southern Heritage Ins. Co.*, 568 S.E.2d 98, 100 (Ga. Ct. App. 2002).

24 939175.1

Form, including the direct inquiry regarding Goldstein's intention to pay the premiums on the Policy and the ultimate beneficiaries are further proof that the information was material.  In the Agent Certification Form American General inquired whether, and Weisz represented that Goldstein would maintain the policy in force primarily for the benefit of her natural beneficiaries; Goldstein would not receive cash payment for applying for and obtaining the Policy; there was no prearranged agreement to transfer the Policy or option or right of first refusal to transfer the Policy to a third party; and the transaction was in compliance with American General's policies as set forth in Field Bulletins regarding Investor Owned Life Insurance, Stranger Owned Life Insurance and Viatical Transactions.

Materiality is further supported by American General's direct inquiries during underwriting as to how Goldstein would fund the premiums due on the Policy.  Obviously, an inability to fund premiums suggests an intention to immediately transfer the Policy.  Thus, upon discovering that Goldstein's income was not as accurately stated in the application, American General inquired directly as to Goldstein's ability to pay the premium.  Goldstein, Berck, Weisz, Weisz and Associates, Shea, Soto, and the Trust each misrepresented to American General that Goldstein planned to liquidate her investment assets and move those assets into the Trust in order to pay premiums on the Policy, thereby concealing and perpetuating the fraud.

### C.    American General Justifiably Relied on the Misrepresentations to its Detriment

"Insurance policies are contracts in which the utmost good faith is required both on the part of the insurer and the insured. A failure by the insured to disclose conditions affecting the risk of which he is aware makes the contract voidable at the insurer's option." *Rust v. Metropolitan Life Ins. Co.*, 36 Del. 294, 295 (Del. 1934) (*citing Stipcich v. Metropolitan Ins. Co.*,

939175.1

277 U.S. 311, 48 S. Ct. 512, 513, 72 L. Ed. 895 (1928)).  Absent ambiguity, an insurer is not

obligated to investigate beyond the face of the insurance application when issuing the policy, and

its reliance upon the representations therein is justified as a matter of law.  *Shafer v. Join*

*Hancock Mut. Life Ins. Co.*, 189 A.2d 234, 237 (Pa. 1963).

Even inconsistency or ambiguity in the application does not require an insurer to fully

investigate all representations in the application.  *See e.g., Pacific Insurance Co. v. Higgins*, C.A.

No. 11284, 1994 Del. Ch. LEXIS 36, *26 (Del. Ch. Mar. 23, 1994) *aff'd mem. Epps v. Pacific*

*Ins. Co.*, 648 A.2d 424 (Del. 1994) (disagreeing with contention that malpractice insurers'

negligence in failing to investigate factual representations as to the pendency of legal claims

against insured precluded a rescission action).  Delaware courts have taken this concept a step

further by finding that: "Even if an insurer should have researched the variety of an applicant's

representations, it has not waived the right to later assert and prevail on a claim for

misrepresentation."  *Oglesby v. Penn-Mutual Life Ins. Co.*, 877 F.Supp. 872, 895 (D. Del. 1994)

(refusing to accept insured's argument that insurer should have noted disclosure of arthritis in

prior application and investigated an inconsistency on the application for the policy at issue).

Defendants argue that American General was aware of a misstatement regarding

Goldstein's net income in the application and imply that American General should have been

tipped off by the misstatement and investigated other representations in the application as well.

In fact, American General did make further inquiry following discovery of the discrepancy as to

Goldstein's income, and received further assurances that notwithstanding Goldstein's current

income, she intended to fully fund the Policy using her own assets.  Defendants even outlined a

plan to use the capital growth from Goldstein's estate and to liquidate certain of her assets to

fund the Policy.  In so doing, defendants compounded and fraudulently concealed the

misrepresentations in the application; thus rendering American General's reliance on the application misrepresentations justifiable as a matter of law.  In any event, whether reliance is justifiable is typically a question of fact, and is therefore not appropriate for disposition at the pleadings stage. *Angrisani v. Capital Access Network, Inc.,* 175 Fed. Appx. 554 (3d Cir. 2006) ("reasonableness of a party's reliance on an allegedly fraudulent statement ordinarily constitutes a question of fact for the jury. Issues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of fact"); *First United Bank & Trust v. PNC Fin. Servs. Group, Inc*., 2009 U.S. Dist. LEXIS 97472 (D. Pa. 2009) ("justifiable reliance is typically a question of fact for the fact-finder to decide"); *Luther v. Kia Motors Am., Inc*., 2009 U.S. Dist. LEXIS 117935 (D. Pa. 2009) ("we recognize that determining whether reliance on a representation is reasonable or justifiable is generally a question of fact"); *O.S. De Braak, Ltd. v. Weymouth Equipment Corp*., 1987 U.S. Dist. LEXIS 9966 (D. Del. 1987) ("reasonable reliance constitutes a question of fact")

### D.     Weisz' Misrepresentation of Goldstein's Present Intent  to Liquidate Assets and Fund the Policy Constitutes Actionable Fraud

Weisz and his associates misrepresented that Goldstein intended to fund the premiums for the Policy.  They also misrepresented the value of Goldstein's estate; i.e., her net worth.   Weisz and his associates compounded these lies by further misrepresenting that Goldstein would liquidate estate assets in order to do so.  Weisz and his associates also misrepresented the purpose of the Policy as "estate planning."  They also misrepresented their capacity as estate planning counsel for Goldstein.  Goldstein never had any intention of funding the premium for the Policy.  She never had any intention of liquidating assets to do so.  She did not intend the

Policy for "estate planning" purposes, and neither Weisz nor his associates ever represented her as counsel.  Therefore, each of the representations made by Weisz and his associates was false when uttered, and Weisz and his associates knew it.  All of these misrepresentations, therefore, are valid and cognizable bases for American General's fraud claim against Weisz.

Representations regarding Goldstein's intent to fund the Policy by liquidating and transferring non-existent assets are statements of present intent which were false when uttered and constitute fraudulent misrepresentations of a fact.  Representations of intent to perform a future act may form the basis for fraud, where the representation of intent is false when made. *See e.g., Brentwater Homes, Inc. v. Weibley*, 471 Pa. 17, 23-25 (Pa. 1977) (finding defendant purchaser intentionally misled plaintiffs sellers as to the use he intended to make of their land – knowing the actual intended use was against the sellers' wishes); *see also Toner v. Allstate Ins. Co.*, 829 F. Supp. 695, 703 (D. Del. 1993) (to be actionable, a statement must be one of fact, not of opinion, as to future events).  Weisz intentionally misrepresented that Goldsein intended to liquidate assets in order to pay premiums on the Policy.  This misrepresentation, and others, were made as statements of fact in the process of procuring the Policy and were made to induce American General to issue a policy that it would otherwise not have issued if the truth had been disclosed.  Thus, this and all other fraudulent misrepresentations identified in the Amended Complaint are actionable as against Weisz and his associates.

The authority cited by Weisz in support of his motion to dismiss the fraud claim is inapposite because those cases dealt with future contingent promises, not present intent.  *See Shoemaker v. Com. Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997) (finding plaintiffs failed to state a fraud claim based upon defendant's alleged promise to obtain insurance for plaintiffs' home if plaintiffs' failed to do so); *see also, Edelstein v. Carole House Apartments, Inc.*, 286

A.2d 658, 661 (Pa. Super. 1971) (a promise to relieve person of liability if certain condition was met is not actionable in fraud).  The misrepresentations at issue in this case were not as to a future contingent promise, but rather as to present intent to do an act.  Therefore, Wiesz's misrepresentations are actionable as fraud.

III.     **THE AMENDED COMPLAINT ESTABLISHES A REASONABLE EXPECTATION THAT THE TRUST LACKED INSURABLE INTEREST AT THE TIME THE POLICY WAS ISSUED.**

The law requires that the owner of a life insurance policy have an insurable interest in the life of the insured when the policy is issued or else the policy is void as an illegal wagering contract.  Virtually all jurisdictions in this country have enacted statutes to ensure that policies are issued only to those who have an insurable interest in the life of the insured.  *See generally 28-174 Appleman on Insurance § 174.03.*  Delaware and Pennsylvania, are no exception.  Both jurisdictions have in place statutes prohibiting issuance of a policy to one who has no insurable interest in the life of the insured.  See 19 Del. Code §§ 2704(a)[14]; 40 Penn. Stats. § 512.[15]  Therefore, whether by common law or statute, or as a matter of public policy, it has long been the law that a contract of life insurance issued to one who has no insurable interest in the life of the insured is deemed void from its inception.  *See, e.g., Baltimore Life Ins. Co. v. Floyd,* 28 Del. 201, 91 A. 653 (1914).

---

[14]     Delaware Code section 2704(a) provides:

An individual of competent legal capacity may procure or effect an insurance contract upon his/her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his/her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

[15]     Title 40, section 512 of the Pennsylvania Statutes provides in part:

Any person may insure his own life for the benefit of any person . . . or trustee of a trust . . . but no person shall cause to be insured the life of another, unless the beneficiary named in such policy or agreement of life insurance, whether himself or a third person, has an insurable interest in the life of the insured. . . .

### A.   The Complaint Sufficiently Pleads That No Insurable Interest Existed at the Time the Policy Was Delivered.

#### 1.   Statutory definitions of insurable interest.

In Delaware and in Pennsylvania, "insurable interest" is statutorily defined.  Both states' statutes provide that an insured has an insurable interest in his or her own life and may designate beneficiaries as he or she sees fit.  40 PA Stat. Ann. § 512 ("Any person may insure his own life for the benefit of any person . . . ."); 18 Del. C. § 2704(a) (insured may "effect an insurance contract upon his/her own life or body for the benefit of any person").  The statutes also define insurable interest in other situations:

> The term "insurable interest" is defined as meaning, in the case of persons related by blood or law, an interest engendered by love and affection, and, in the case of other persons, a lawful economic interest in having the life of the insured continue, as distinguished from an interest which would arise only by the death of the insured.

40 Penn. Stats. § 512.  Delaware's statutory definition of insurable interest is more complex, separately addressing the insurable interest of relatives, § 2704(c)(1); others with a substantial economic interest in the insured's continued life rather than in his or her death, § 2704(c)(2); employers, § 2704(c)(3); business partners or similar relationships, § 2704(c)(4); and the one most relevant here, trusts, § 2704(c)(5).

Section 2704(c)(5), concerning insurable interest of trusts provides,

> The trustee of a trust established by an individual has an insurable interest in the life of that individual and the same insurable interest in the life of any other individual as does any person who is treated as the owner of such trust for federal income tax purposes.  The trustee of a trust has the same insurable interest in the life of any individual as does any person with respect to proceeds of insurance on the life of such individual (or any portion of such proceeds) that are allocable to such person's interest in such trust. . . .

Pennsylvania's insurable interest statute is less detailed with regard to trusts, stating only that an individual may insure his own life for the benefit of "a trust established by" that person.  40 PA Stat. Ann. § 512.

When strangers are involved in the life insurance transaction, a life insurance trust drafted or created by these strangers begs the question whether the trust was "established by" the insured, even if the insured signed it.  Indeed, Berck – a high-profile participant in many STOLI cases – was the Trustee of the Trust, and Weisz and Associates – another high profile participant in other STOLI cases – was the insurance producer and also purported to serve as estate planning counsel for Goldstein.  This lawsuit posits that the Trust was not "established by" Goldstein at all, but rather by the investor defendants.

2.    <u>Time as of which insurable interest must exist.</u>

As defendants point out in their moving papers, the Delaware statute specifies that the insurable interest must exist "at the time when such contract was made," 18 Del. Code § 2704(a).  *See also* 40 Penn. Stats. § 512 ("If a policy of life insurance has been issued in conformity with this section, no transfer of such policy or any interest thereunder shall be invalid by reason of a lack of insurable interest of the transferee in the life of the insured or the payment of premiums thereafter by the transferee. . . .").

Because Goldstein's husband nominally held the beneficial interest in the Trust at the time the policy was issued,[16] defendants summarily conclude that the statutory requirements for

---

[16]    A trust's insurable interest is derived from the presence or absence of the insurable interest on the part of the beneficiaries of the trust.  A trust and its trustee hold bare legal title to the trust assets and must administer the assets for the benefit of the trust beneficiaries who hold equitable title to the assets.  To properly assess insurable interest, therefore, the court must consider whether the beneficiaries of the trust have an insurable interest in the life of the insured.  *See Maryland. Nat'l Bank v. Tower,* 374 F.2d 381, 382-86 (4th Cir. 1967) (holding that trustee of pension plan had insurable interest to extent benefits were due to

939175.1

insurable interest were fully satisfied.  With the sharp rise in the number of STOLI schemes

perpetrated by sophisticated individuals and companies, however, superficial compliance with

statutory requirements is the *beginning* of the court's inquiry into the legitimacy of the

transaction, not the end.

### B.    Intent to Sell the Policy Invalidates Insurable Interest.

The more searching analysis of the insurable interest issue demanded by the courts seeks

to determine whether the insured purchased the policy in "good faith"—i.e., without a present

intent to transfer the policy to a third party with no insurable interest in his or her life—

regardless of how ownership is designated in the original policy.  Courts are increasingly aware

that STOLI schemes typically use trusts to conceal the true nature of the transaction.  Indeed,

2008 and 2009 saw an explosion of litigation, much of it brought by insurers, to address the

creativity of investors in the secondary life insurance market in dodging the insurable interest

requirements by arranging for individuals or trusts with a nominal insurable interest to hold the

policy for a short period – sometimes just a day or two – before transferring it to an investor.

Defendants acknowledge that an agreement between a specified third party and the

insured, if proven to have existed at the time of the application, would violate the insurable

interest statutes.  However, they insist that a unilateral intent on the part of the insured or trust

beneficiary to sell his or her beneficial interests is insufficient to do so.  Defendants' reasoning is

misguided for several reasons.

---

beneficiary of pension plan); *Gibbons' Estate,* 200 A. 55, 56-57 (Pa. 1938) (holding that insurable interest existed where trust was established for the benefit of creditors of the insured); *Butler v. State Mut. Life Assur. Co.,* 8 N.Y.S. 411, 412 (N.Y. Sup. Ct. 1890) (trust lacked insurable interest because the beneficiary of the trust was not related to the insured).

939175.1

1.   Defendants' arguments lack support as *Evans* and *Paulson* are inapposite, especially at the pre-discovery pleadings stage.

Defendants principally rely on two cases for the proposition that the participation of a specified third party at the inception of the policy must be pleaded, which cases are fully distinguishable from the present case.  In *First Penn-Pacific Life Insurance Co. v. Evans,* 313 Fed.Appx. 633 (4th Cir. 2009), the court upheld a grant of summary judgment in favor of the policy owner and against the insurer based upon the lack of *evidence* of the participation of any third party in the procurement of the policy.  *Evans* was not decided on a motion to dismiss based upon the allegations in the complaint.[17]  Defendants also rely upon *Sun Life Assurance Co. of Canada v. Paulson,* 2008 U.S. Dist. LEXIS 11719 (D. Minn. Feb. 15, 2008) ("*Paulson I*").  In *Paulson I,* the magistrate judge granted a motion to dismiss on the ground that the complaint failed to allege that a specified third party intended to purchase the policy at the time it was procured.  However, Sun Life was given an opportunity to take discovery prior to amending the complaint to add the specific information suggested by the court.  According to the second *Paulson* case, 2008 U.S. Dist. LEXIS 99633 (D. Minn. Dec. 3, 2008) ("*Paulson II*"), seven months of discovery did not reveal any prearrangement to sell the policy, and so amendment of the complaint was denied as futile.  *Id.* at *11.

Thus, the *Paulson* cases, like *Evans,* involved evidentiary considerations.  To that extent, both can be read to *support* American General's right to go forward in this action, whether or not leave to amend is deemed necessary.  Both of these cases permitted the taking of discovery before any judicial assessment of the true nature of the transaction.  In the insurable interest context, this result is consistent with the rule that ""[t]he existence of actual intent is a question

---

[17]     Notably, another case mentioned by defendants, *Lincoln National Life Insurance Co. v. Fishman,* 638 F.Supp.2d 1170 (C.D. Cal. 2009), also was decided on summary judgment and not on a pleading motion.

of fact," *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1304 (3d Cir. 1986); matters of intent are not properly addressed at the pleading stage.

*Paulson* and *Evans* are neither binding nor persuasive. The court in *Paulson I* reached its conclusion based upon the law of the case doctrine. Given that the magistrate judge's order in *Paulson I* was unpublished, as was *Paulson II,* the order otherwise had no precedential value even in Minnesota. Moreover, the purported "mutual intent" rule in fact appears to be exceptional. The majority of cases dealing with the issued have held unilateral intent to transfer sufficient to vitiate insurable interest. This view is consistent with the fact that the details of the behind-the-scenes dealings of the parties to the transfer are unlikely to be apparent to the insurer, especially before discovery has been taken.

2.     <u>Mutual intent is not required.</u>

In *Lincoln National Life Insurance Co. v. Calhoun*, 596 F.Supp.2d 882 (D. N.D. 2009), the complaint alleged that an agent had approached an elderly individual, Calhoun, to solicit his participation in an arrangement whereby Calhoun "'would apply for a life insurance policy and sell it for a profit without any cost whatsoever'" to him. The Calhoun Family Trust was created to hold the policy. Lincoln National brought a declaratory relief action even before any sale of the policy could take place, having come to believe that Calhoun intended to sell or assign it to stranger investors. *Id.* at 886. The court acknowledged relevant statutes (California's and New Jersey's) permitting transfer of ownership to a person without an insurable interest. In denying a motion to dismiss, the court nevertheless refused to end the inquiry at purported facial compliance with the statutes and emphasized the insured's intent at the time of purchase:

> Insureds begin to run afoul of the insurable interest requirement . .
> . when they intend at the time of the policy's issuance, to profit by

> transferring the policy to a stranger with no insurable interest at the
> expiration of the contestability period.

*Id.* at 889.   The court concluded that, "because issues of intent are crucial to this determination,

dismissal at this juncture would be premature."  *Id.* at 890.   The court allowed the action to go

forward so that Lincoln National could take discovery to determine whether a sale of the policy

was planned at the time the application was submitted.  *Id.*   Given that the third party transaction

had not yet even been consummated at the time Lincoln National brought its declaratory relief

action, unilateral intent necessarily was sufficient to void the transaction, assuming that the facts

bore out the pleaded allegations.

Similarly, in *Life Product Clearing LLC v. Angel*, 530 F.Supp.2d 646, 653 (S.D.N.Y.

2008), the court stated:

> Only one who obtains a life insurance policy on himself 'on his
> own initiative' and in good faith -- that is, with a genuine intent to
> obtain insurance protection for a family member, loved one, or
> business partner, rather than an intent to disguise what would
> otherwise be a gambling transaction by a stranger on his life -- may
> freely assign the policy to one who does not have an insurable
> interest in him.

In *Angel,* an elderly insured was alleged to have a pre-arranged plan to transfer his interest in the

policy, by means of a trust, to an investor.  He never paid any premiums himself and effected the

transfer immediately upon issuance of the policy.  The court denied LPC's motion for judgment

on the pleadings, noting that, under New York law, "immediate surrender of a policy is

permissible, but only if the initial acquisition of the policy was in good faith and there was no

prior intent or agreement to transfer it to an otherwise disinterested investor."  *Id.* at 656.  The

court determined that the facts remained to be developed in continuing litigation.  Relevant

factors were said to include "whether the insured paid premiums and the length of time the

insured held the policy before assigning it when deciding whether an arrangement is simply a

sham transaction designed to evade the insurable interest rule or a genuine, good-faith assignment." *Id.* at 654. Like the court in *Calhoun,* this court noted that "cases that turn on the issue of intent are generally not appropriate for summary disposition." *Id.* at 656.

In *AXA Equitable Life Insurance Co. v. Infinity Financial Group,* 608 F.Supp.2d 1349 (S.D. Fla. 2009), the policies were assigned by means of the trust mechanism to outside investors. Like Delaware, Florida permitted assignment of life insurance policies to persons without an insurable interest in the life of the insured. *Id.* at 1356. "But this rule extends only to assignments made in good faith, and not to sham assignments made simply to circumvent the law's prohibition on 'wagering contracts.'" *Id.* The court concluded,

> If the plaintiff's allegations are true, the insured never planned to maintain the policies themselves. Rather, the policies were procured only as part of a plan established from the outset, under which third parties were to pay the premiums for the policies and the insured would immediately assign their policies to entities in which other parties would maintain interests. Thus, the amended complaint adequately states allegations that, if proven, would render the policies void for lack of an insurable interest.

*Id.* at 1357 (citation omitted). The court therefore denied the defendants' motion to dismiss the insurable interest count of the complaint. *Id.* [18]

Here, the Amended Complaint pleads *inter alia* that XLI, rather than Goldstein or the Trust, paid at least the bulk of the premiums for the American General policy (Complaint, ¶ 5), and that the Trust was never intended to maintain a controlling or beneficial ownership interest in the policy (¶ 7). Stanford Goldstein sold his beneficial interest in the Trust to Tall Tree, which

---

[18]     *Accord, Phoenix Life Ins. Co. v. LaSalle Bank N.A.,* 2009 U.S. Dist. LEXIS 26468 (E.D. Mich. 2009) ("Finally, it appears that it *would* violate the insurable interest requirement if, at the time the policies issued, the insured intended to transfer the entire proceeds of the insurance policies to LaSalle, because such an agreement would be a cloaked 'wagering contract' under *Warnock* and *Grigsby.* . . .The test for determining whether the assignment is valid is the intent of the parties.") (emphasis in original; citations omitted).

had no insurable interest in the insured's life, less than a month after issuance of the policy and within six days of its delivery to the Trust (¶ 49); and Tall Tree sold its interest to XLI three weeks after that (¶ 50).   The Amended Complaint also alleges that American General's investigation, including an interview with Goldstein's daughter, confirmed that Goldstein's income, net worth, and reason for applying for the policy were misrepresented (¶ 58), and that, contrary to the representation made to American General, Goldstein did not liquidate her investment assets to pay the premiums for the policy (¶ 59).   These allegations alone point to Goldstein's intent at the time of the application and, indeed, to the existence of an undisclosed agreement with one or more of the defendants to purchase the policy.   Berck's involvement in the Trust immediately before the application was taken, established by the Trust Agreement itself (XLI's Exhibit A), adds even more weight to these allegations.

3.      Intent, mutual or otherwise, may be inferred from conduct.

Reasonable inferences drawn from the allegations of the Amended Complaint demonstrate defendants' intent to transfer as of the date of issuance.   In this case, intent – not only Goldstein's, but also that of the subsequent purchasers of beneficial or ownership interests in the policy – reasonably may be inferred from their conduct.   *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp,* 919 F.2d 206, 214 (3d Cir. 1990); *Godina v. Oswald,* 206 Pa. Super. 51, 55-57, 211 A.2d 91 (1965); *cf. Stauffer v. Stauffer*, 465 Pa. 558, 574, 351 A.2d 236, 244 (1976) ("It is clear that a fraudulent intention at the time of a transaction can be inferred from the totality of the circumstances surrounding the transaction, including subsequent conduct on the part of the defendant.").

The Amended Complaint alleges the funding of the policy by XLI and the sale of the beneficial interest in the policy to Tall Tree three weeks after the policy was issued.   The Trust

Agreement attached as an exhibit to XLI's motion establishes that Berck was involved even before the application for the policy was signed, as he was the Trustee of the Trust dated one day before the date of the application.  These factual circumstances reasonably give rise to the inference of an intent to participate in this STOLI scheme, not only on Goldstein's part, but also on the parts of the other defendants.[19]

In short, it is not enough simply to point to the statutory language concerning the permissibility of post-purchase transfers to individuals with no insurable interest.  American General does not dispute that the statute says what it says.  However, "only interests in valid policies may be transferred, and if there was a pre-assignment agreement to transfer to [an entity with no insurable interest] the Policy is an invalid wager policy."  *Angel,* 530 F.Supp.2d at 656. Whether unilateral or mutual intent must be shown, the pleaded and admitted facts and the reasonable inferences that may be drawn from them sufficiently point to the invalidity of the transaction based on lack of insurable interest, or at a minimum, raise a reasonable expectation that discovery will lead to evidence of the pre-issuance intent to transfer.

---

[19]     *See generally* "Validity of assignment of life insurance policy to one who has no insurable interest in insured," 40 A.L.R.2d 1310 (West Group 2009), which states at n.40:

> A factor of great importance, which has been stressed in many cases, is the amount of time which elapsed from the procurement of the policy until its assignment to a person without an insurable interest in the life of the insured. It may be stated generally that the length of time elapsing between these two events stands in direct proportion to the likelihood of the assignment being upheld as valid.

The court in *Angel,* 530 F. Supp. at 654, similarly observed that both premium payments and the timing of the assignment are considered in evaluating the good faith of the insurance transaction:

> Courts consider factors such as whether the insured paid premiums and the length of time the insured held the policy before assigning it when deciding whether an arrangement is simply a sham transaction designed to evade the insurable interest rule or a genuine, good-faith assignment.

IV.   **THE AMENDED COMPLAINT ESTABLISHES A REASONABLE EXPECTATION THAT AMERICAN GENERAL IS ENTITLED TO RETAIN PREMIUMS TO BE RESTORED TO ITS STATUS QUO ANTE**

Because American General seeks to rescind the Policy based upon defendants' fraud in the application and lack of insurable interest, American General should not be required to refund premiums except, perhaps, to the extent that premiums paid exceed all of the costs and fees incurred by American General in detecting the fraud and obtaining rescission.  Without such an offset against premium refund, the victim of the fraud – American General – will not be fully restored to its pre-contract position as contemplated by equity.  To require full refund of premiums in all cases has the abhorrent effect of rewarding insurance fraud by restoring fraudfeasors to their status quo before the Policy was issued, but denying that remedy to the innocent party, in this case American General.  Under this approach, there is no pecuniary disincentive for a would-be fraudfeasor to engage in insurance fraud.  If the fraud is detected, all monies paid for the insurance will merely be returned in the form of a premium refund. Juxtaposed against the potential for multi-million-dollar pay-outs if undetected, there is in fact a significant incentive to engage in the fraud; nothing ventured, nothing gained.

Accordingly, courts administering equity in cases of policy rescissions based on fraud in the application typically distinguish between misrepresentations innocently made and those made with the intent to deceive; holding that one who procures a policy through intentional fraud is not entitled to a refund of any premiums.  *See, e.g., Hohenschutz v. Knights of Columbus*, 186 S.W.2d 177, 178 (Ark. 1945) (where the court distinguished authorities requiring premium refund as involving unintentional misrepresentation in application); *Modern Woodmen of Am. v. Int'l Trust Co.,* 136 P. 806, 814-15 (Colo. App. Ct. 1913) (where the court observed that "'The general doctrine laid down by the text-book writers is that an unintentional breach of warranty on

the part of the insured does not authorize a retention of the amount paid as assessments, if no risk has been run by the insurer; but actual fraud in the inception of the contract on the part of the insured forfeits his claim to a return of assessments, notwithstanding the fact that no risk has ever attached.'"") (*citing Taylor v. Grand Lodge A.O.U.W.*, 105 N.W. 408 (Minn. 1905)); *Nat'l Counsel of Knights and Ladies of Security v. Garber*, 154 N.W. 512, 513 (Minn. 1915) (setting forth the rule that premium must be refunded only in the case of innocent misrepresentation, but not in the case of intentional fraud); *Bosse v. Knights & Ladies of Sec.*, 220 S.W. 993, 995 (Mo. Ct. App. 1920) (same); *McDonald v. Northern Benefit Assoc.*, 131 P.2d 479 (Mont. 1942) (same); *Edward G. Budd Bldg. & Loan Ass'n v. Kinsella*, 156 A. 577 (Pa. Super. Ct. 1931) (recognizing that there is no right to return of premium on policy voided due to voluntary breach or violation of covenants, such as intentional fraud).

> Upon general principles of law, as well as of sound policy and morality, it may be safely laid down as a rule, that if the insured, by deception and false pretences, induces others to undertake a risk, which, had the truth been disclosed, they would not have taken at all, or would have done so on different terms from those agreed upon, thereby securing to the insured a chance to claim an indemnity in case of loss, or a return of premium in case of safe arrival; it is such a fraud as ought to defeat his right to maintain this action, for the premium.

*Ray v. United States*, 121 F.2d 416, 419 (7th Cir. 1941) (*citing Schwartz v. U.S. Ins. Co.*, 21 Fed.Cas. 770, 772 (C.C.Pa. 1812)); *see also Columbian Nat'l Life Ins. Co. v. Mulkey*, 91 S.E. 106 (Ga. 1916) (holding no premium refund necessary to seek rescission of a policy obtained through intentional fraud reasoning that such a rule is an invitation to fraud because of the potential reward if the fraud is undetected and lack of any adverse consequences if the fraud is detected).

Likewise, where it is shown that the policy was illegal because of lack of insurable interest, an insurer is permitted to keep the entire premium paid despite voiding the policy. *See, e.g., Endress v. Insurance Co.,* 1 Ohio Law Abs. 553 (Ohio Ct. App. 1923); *American Mut. Life Ins. Co. v. Mead*, 79 N.E. 526, 528 (Ind. Ct. App. 1906) (reasoning that insurer was the more innocent of the two parties because it was unaware of the lack of insurable interest at the time of contracting, and therefore should be made whole at the expense of the policy owner); *Work v. American Mut. Life Ins. Co.*, 67 N.E. 458 (Ind. Ct. App. 1903) (holding that one who knowingly obtains policy lacking insurable interest is not entitled to premium refund even if the insurer was *in pari delicto*); *Lewis v. Phoenix Mut. Life Ins. Co.*, 39 Conn. 100, 102 (1872) (where the court allowed an insurer to keep the premium as consideration for the responsibility, risk, and inconvenience to which it was exposed by the acts of the policy owner).

In the case of a contract that is void by reason of illegality, the parties are not only denied the right to enforce the contract, but are also denied restitution for any benefits they have conferred pursuant to it. *Narragansett Indian Tribe v. RIBO, Inc.*, 686 F. Supp. 48, 51 (D.R.I. 1988) (where a contract is void by reason of its violation of a federal statute, the court will neither assist the parties in carrying out their illegal bargain nor will it, ordinarily, help restore them to their former positions by returning to them monies paid pursuant to the contract). Thus, where there is a lack of insurable interest rendering the policy voidable, the insured and/or policy owner may be denied restitution of any kid.

Courts also specifically recognize the inequity of a rule that in all cases restores the defrauding party to his/her pre-contract position, but fails to restore the one defrauded. Thus, in *Elliott v. Knights of Modern Maccabees*, 46 Wash. 320, 326 (1907), the court recognized that refunding premiums paid for a policy voided due to fraud in the application would be inequitable

because it would result in the insurer not being restored to its pre-contract position since it used

the money in connection with costs and other obligations.  Other courts allowed the insurer to

keep the premium as consideration for the fraud committed upon it in obtaining issuance of the

policy.  *Marling v. Metropolitan Life Ins. Co.*, 1908 Ohio Misc. LEXIS 46, at *9-10 (Ohio Ct.

C.P. 1908).  A party guilty of intentional fraud is also said to lack standing in courts of equity to

seek refund of premiums paid as part of their unlawful gamble.  *Hellman v. Nat'l Council of*

*Knights and Ladies of Sec.*, 200 S.W. 698 (Mo. Ct. App. 1918) (holding that one who has

"voluntarily parted with his money in an effort to defraud . . .will be held to have no standing in

court to prosecute and action" to recover that money).  Recovery of the full amount of the

premiums after the insurer has sustained the risk of the insurance and the insured is "obviously

unjust and is so recognized by the better authorities."  5 *Williston on Contracts* §§ 1330, at 3737-

38, 1460A, at 4085 (1937).

Courts have broad discretion to fashion restitution through consideration of the equities,

including the fraud factor.

> Fashioning or withholding equitable relief, taking into account
> special circumstances like a defendant's soiled hands, rests
> uniquely within the discretion of the trial court…the broad
> discretion conferred on the trier liberates….allowing it to weigh
> the equities, evaluate competing wrongs, and determine which
> party, if either, is more deserving of equitable relief.

*Borden v. Paul Revere Life Ins. Co.* 935 F.2d 370, 377 (1st Cir. Mass. 1991).  Where it seems

equitable on the particular facts of the case to allow rescission without complete or perfect

restoration, relief is favored, and courts of law need not adhere to strict construction.  27

*Williston on Contracts*, § 69:51 (4th ed. 2000).  A rescinding party is not required to return

consideration when to do so would be unreasonable or impossible; moreover, the restoration

required to be made does not require that the other party be placed in the exact situation it was in

before the contract, only that it be placed substantially in its original position. *Wender &
Roberts, Inc. v. Wender*, 238 Ga. App. 355 (1999) (emphasis added). At least one modern
treatise recognizes that a tender of premiums to the beneficiary is required only *where the
beneficiary is entitled to such premiums.* 2 *Couch on Insurance* § 32:63 (3rd ed. 2007)
(emphasis added). "Where the policy transaction is a fraud upon the insurer there is no
obligation on the insurer to return the unearned premiums upon canceling the policy." *Id.*

Some courts have also permitted an offset against premium refund for the cost of the
insurance and/or the value of the insurance while the policy was in force because refunding all
premiums to the insured who seeks rescission also overlooks the fact that the insured received
value during the policy's existence. *Perlman v. Prudential Ins. Co. of Am.*, 686 So. 2d 1378,
1380 (Fl. Dist. Ct. App. 1997); *see also Mutual Reserve Fund Life Ass'n v. Ferrenbach*, 144 F.
342, 344-345 (8th Cir. 1906) ("there is no more reason for saying that an insured has nothing of
value until he dies than there is for saying that one is not benefited by a policy of fire insurance
unless his house is destroyed by fire"); *Arad v. Caduceus Self Ins. Fund, Inc.*, 585 So. 2d 1000
(Fla. Dist. Ct. App. 4th Dist. 1991) ("there are intangibles that are afforded one who has life
insurance protection…for example, it is much easier to secure credit or a loan if one has a life
insurance estate"). Thus, in *Perlman*, the court rejected the reasoning behind the rule requiring a
full return of premiums reasoning that such a requirement "is erroneously in conflict with the
principle that the parties to a rescinded agreement are required, insofar as possible, to restore the
*status quo*." *Id.* at 1381. *Perlman* recognized that "the expenses of perpetrating a fraud are not
fair costs, or ones for which the perpetrator should be recompensed by the victim." *Id.* In
*Albertus v. Icoa Life Insurance Company*, the insured sought to rescind the policy on the ground
of fraud. 247 Or. 618 (1967). The insurance company appealed a decision of the lower court

requiring the full return of premiums to the insured.   Noting that a condition of restitution is the restoration of the *status quo,* the court permitted the insurer to offset its actual costs of carrying the risk while the policies were in force against premiums returned to the insured.   *Id.* at 620-621.

Therefore, if fraudulent misrepresentations were intentionally made in the application and/or the Trust lacked insurable interest at the time of issuance, equitable considerations dictate that American General is entitled to rescind.   The equities further dictate that American General, as the innocent party, should be made whole, even at the expense of one or more of the defendants, the fraudfeasors.   Therefore, if fraudulent misrepresentations were intentionally made in the application and/or the Trust lacked insurable interest at the time of issuance, American General should be permitted to keep all of the premiums paid, or whatever portion of the premiums is necessary to offset all of American General's costs and fees.   The Amended Complaint does allege facts sufficient to give rise to at least a reasonable expectation that discovery will reveal evidence establishing intentional fraud in the application and/or lack of insurable interest.   Therefore, the Amended Complaint alleges facts sufficient to give rise to at least a reasonable expectation that discovery will reveal evidence establishing American General's right to rescind and keep all or a portion of the premiums paid for the Policy.

## V.   THE AMENDED COMPLAINT RAISES A REASONABLE EXPECTATION THAT DEFENDANTS CONSPIRED TO COMMIT FRAUD UPON AMERICAN GENERAL

As set forth above, American General's First Amended Complaint sets forth claims for fraudulent misrepresentations against defendants with sufficient particularity.   Contrary to defendants' assertions, the civil conspiracy count is also sufficiently pled under the applicable, more liberal, pleading standards of Rule 8.   Where the alleged conspiracy is to defraud, courts

within this Circuit have held that while the underlying allegations of fraud must be pled with particularity pursuant to Rule 9(b), "the allegations 'of conspiracy are measured under the more liberal . . . [Fed. R. Civ. P. 8(a)] pleading standard.'"  *U.S. ex rel. Paul E. Atkinson v. Pa. Shipbuilding Co.*, 2000 U.S. Dist. LEXIS 12081 (E.D. Pa. 2000); *Emcore Corp. v. PriceWaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 264 (D.N.J. 2000) (refusing to apply Rule 9(b) pleading standard to a claim for a civil RICO conspiracy); *Jairett v. First Montauk Sec. Corp.*, 203 F.R.D. 181, 188 (E.D. Pa. 2001); *China Resource Prods. v. Fayda Int'l*, 788 F. Supp. 815, 819 (D. Del. 1992).

Under Pennsylvania law, a claim for civil conspiracy requires: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means *or for an unlawful purpose*; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000).  Similarly, under Delaware law, a civil conspiracy is the combination of two or more persons either *for an unlawful purpose*, or for the accomplishment of a lawful purpose by unlawful means, resulting in damage. *Abbott v. Gordon*, C.A. No. 04C-09-055, 2008 Del. Super. LEXIS 103, 61-62 (Del. Super. Ct. 2008).  A conspiracy plaintiff is "not required to present direct and positive testimony of a collusive agreement to do something unlawful.  The nature of the crime attempted usually makes it susceptible of no other proof than by circumstantial evidence." *Id*. (*quoting Kaiser v. Ins. Co. of North America*, 117 A. 791, 792 (Pa. 1922).  Subsequent acts may be evidence of a conspiracy and may justify the conclusion that the acts were done in furtherance of a conspiracy or "unlawful combination." *Id.* (*quoting Novic v. Fenics*, 11 A.2d 871, 874 (Pa. 1940)).  At the pleadings stage, the allegations of conspiracy "'must be sufficient to 'describe the general composition of the conspiracy, some or all of its

broad objectives, and the defendant's general role in that conspiracy.'" *Id*. at 820 (citing *Rose v. Bartle*, 871 F.2d 331, 336 (3d Cir. 1989)).

American General has pled that defendants engaged in, facilitated, encouraged, aided and abetted and/or otherwise acted in furtherance of an overall scheme and conspiracy to solicit elderly persons, including Goldstein, and procure life insurance policies from insurers, including American General, for which Goldstein and others could not qualify based upon their true net worth, income, reasons for purchasing the insurance, and because of state insurable interest laws, which Defendants endeavored to circumvent.  Each Defendant's general role in that conspiracy is identified in the First Amended Complaint as follows:

- In connection with the Application, Goldstein, Berck, Weisz, Weisz and Associates and the Trust misrepresented Goldstein's personal net worth, including her real estate holdings;

- Goldstein, Berck, Weisz, Weisz and Associates and the Trust misrepresented to American General that Goldstein would liquidate certain assets and move those assets into the Trust in order to fund premiums for the Policy;

- Goldstein, Berck, Weisz, Weisz and Associates, and the Trust misrepresented to American General that the Policy was being purchased for purposes of "estate planning;"

- Subsequent to issuance of the Policy and in furtherance of the scheme, Tall Tree Advisors, Inc. purchased a beneficial interest in the Trust and promptly sold its interest to XLI;

-  Following his appointment as Trustee, Laskaris and a representative of XLI executed a Change of Ownership form, requesting a change in ownership of the Policy from the Trust to XLI;

- A representative of XLI executed a Change of Beneficiary Form designating XLI as the primary beneficiary of the Policy.

Through the foregoing misrepresentations, omissions and acts, defendants accomplished the procurement of the Policy for which Goldstein did not qualify and the creation of a sham

trust to conceal and facilitate the transfer of the Policy to a party with no insurable interest in

Goldstein's life.  The transfer of the Policy to an investment fund within days of delivery to the

Trustee justifies the inference, if not the conclusion, of a prior collusive agreement to engage in a

STOLI transaction.  Thus, the Amended Complaint describes the general composition of the

conspiracy, some or all of its broad objectives, and the defendants' general role in that

conspiracy.  Accordingly defendants' motion to dismiss the civil conspiracy count should be

denied.

## VI.     THE AMENDED COMPLAINT RAISES A REASONABLE EXPECTATION THAT AMERICAN GENERAL WILL BE ENTITLED TO PUNITIVE DAMAGES

Federal courts sitting in diversity look to applicable state law to determine whether and to

what extent to award punitive damages.  *Browning-Ferris Indus. v. Kelco Disposal Inc.*, 492

U.S. 257, 278, (1989).   Regardless of which states' law applies here, American General should

be awarded punitive damages because the defendants acted intentionally, maliciously, and with

wanton disregard for the rights of American General.

Under Delaware law, punitive damages are recoverable "in situations where the

defendant's conduct, though unintentional, has been particularly reprehensible, *i.e.,* reckless, or

motivated by malice or fraud**."**  *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987).  Punitive

damages can also be recovered when the defendant's conduct exhibits a wanton or willful

disregard for the rights of the plaintiff.  *Porter v. Turner*, 954 A.2d 308, 313 (Del. 2008).  A

defendant's conduct is willful or wanton when it reflects a "conscious indifference" or "I don't

care" attitude.  *Id.*  In addition, a plaintiff can recover punitive damages under Delaware law for

willful or malicious breach of contract.  *Jardel Co.* 523 A.2d at 529.  For instance, in *Christ v.*

*Cormick*, 2008 WL 4889127  (D. Del. Nov. 10, 2008), the court held that punitive damages were

47 939175.1

justified because the defendants' "pattern of misconduct" regarding an investment contract was sufficiently intentional and malicious.  *Christ,* 2008 WL 4889127 at 3; *Christ v. Cormick* 2007 WL 2022053, 2 (D. Del. July 10, 2007).  Generally, Delaware case law characterizes willfulness as "an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences," *Jardel Co.* 523 A.2d at 529.

Similarly, punitive damages are generally recoverable under Pennsylvania law if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.  *Hall v. Jackson*, 788 A.2d 390 (Pa. Super., 2001).  Additionally, a cause of action for fraud or misrepresentation can support a claim for punitive damages.  *McClellan v. Health Maintenance Organization of Pennsylvania*, 413 Pa. Super. 128, 144 (1992).  Indeed, Pennsylvania courts frequently hold that "it is difficult to picture a fact pattern which would support a finding of intentional fraud without providing proof of 'outrageous conduct' to support an award of punitive damages."  *See e.g. McClellan* 413 Pa. at 144.  Punitive damages are also recoverable for breach of contract under Pennsylvania law if the breach also includes a breach of some duty imposed by society.  *White v. George*, 66 Pa. D. & C.4th 129, 155 (Pa. County Ct. 2004).

Thus, in *Littleton v. Young*, 1992 Del. LEXIS 15 (Del. Jan. 2, 1992), plaintiff inspected defendant's residence with the intention of purchasing it.  *Id.* at 2.  During the inspection, defendant actively concealed water damage in the garage and basement.  *Id.* at 2-4.  The plaintiff specifically asked the defendant about any water problems, to which the defendant responded in the negative.  *Id.* at 2-3.  The plaintiff eventually purchased the residence and subsequently discovered evidence of considerable water damage.  *Id.* at 3.  Plaintiff prevailed at trial with respect to his misrepresentation claim against the defendant, but the trial court declined to

48 939175.1

instruct the jury to assess punitive damages. *Id*. at 5.  The Delaware Supreme Court reversed the trial court's decision, ruling that the plaintiff was in fact entitled to a jury instruction allowing for the assessment of punitive damages. *Id*. at 8.  The Court ruled that the defendant's state of mind met the standard for punitive damages because his concealment was "deliberate and persistent," and was "motivated solely by financial gain." *Id*. at 7.  *See also*, *Smith v. Ford*, 68 Pa. D. & C.4th 432 (Pa. County Ct. 2004) (where the Court dismissed the defendants' preliminary objection to plaintiff's claim for punitive damages in connection with the sale of a car in which defendants lied about and concealed damage from past accidents and the vehicle's actual mile reasoning that "the plaintiff alleged that the defendants made specific, intentional, knowing, and/or reckless misrepresentations concerning the status of the automobile.")

Likewise, American General is entitled to maintain its claim for punitive damages because defendants acted intentionally, maliciously, and with wanton disregard for the rights of American General.  Defendants intentionally or with wanton disregard for American General's rights to true and complete information misrepresented Goldstein's net worth and the reason for the Policy.  American General specifically inquired as to the purpose of the policy and Goldstein's net worth.  Similar to the defendant in *Littleton*, defendants here misrepresented these important facts and were solely motivated by financial gain.  Moreover, defendants' "pattern of misconduct," as illustrated by the fact that many if not all of the defendants are known to have participated in multiple STOLI schemes against American General and other insurers, demonstrates that their actions were done intentionally and maliciously, thus warranting punitive damages for breach of contract.

American General is therefore entitled to maintain its claim for punitive damages because the Amended Complaint alleges facts which meet the requisite elements of both Delaware and

Pennsylvania law for punitive damages.  At an absolute minimum, the Amended Complaint alleges sufficient facts to raise a reasonable expectation that discovery will reveal that Defendants acted intentionally, maliciously, and with wanton disregard for the rights of American General.

### VII.   THE AMENDED COMPLAINT RAISES A REASONABLE EXPECTATION THAT WEISZ AND WEISZ AND ASSOCIATES ASSUMED AND BREACHED A FIDUCIARY DUTY

An insurance producer quite clearly owes a fiduciary duty to its insurer principal in both Delaware[20] and Pennsylvania[21] as a matter of law.  An insurance producer's fiduciary duties to its principal include a duty to "disclose information that is relevant to the affairs of the agency entrusted to him," *Science Accessories Corp. v. Summagraphics Corp.*, 425 A. 2d 957, 962 (Del. 1980), and "the agent is subject to a duty of loyalty to act only for the principal's benefit." *Markocki*, F. Supp. 2d 413, 421.  An insurance agent's fiduciary duty "requires the agent to act with the utmost good faith in carrying out the interests of his principal and to promptly advise the principal of ***all relevant facts and circumstances known to the agent.*** *Mountbatten Sur. Co.*,

---

[20] As to Delaware law: *See, e.g., McMahon Bros. Realty Co. v. United States Fidelity & Guaranty Co.*, 217 F. Supp. 567 (D. Del. 1963)(finding that an insurance agent violated the fiduciary duty which it owed to the defendant insurer when he fraudulently procured his own insurance policy); *see also Barkauskie v. Indian River Sch. Dist.*, 951 F. Supp. 519, 544 (D. Del. 1996) ("Delaware law recognizes the existence of a fiduciary relationship between principals and agents"); *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing.").

[21] As to Pennsylvania law: *See, e.g., Markocki v. Old Republic Nat'l Title Ins. Co.*, 527 F. Supp. 2d 413 (D. Pa. 2007) (breach of fiduciary duty claims brought by defendant-counterclaimant title insurer against its agent survived dismissal because Pennsylvania law imposes a fiduciary duty on agents); *see also Amendolia v. Rothman*, 2003 U.S. Dist. LEXIS 22719 (D. Pa. 2003) ("an insurance broker is under a duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under similar circumstances"); *Mountbatten Sur. Co. v. Brunswick Ins. Agency*, 2001 U.S. Dist. LEXIS 24224 (D. Pa. 2001) ("under Pennsylvania law, an agent owes a fiduciary duty to its principal to act for the principal's benefit in all matters within the scope of the principal and agent relationship"); *Contawe v. Crescent Heights of Am., Inc.*, 2004 U.S. Dist. LEXIS 20344 (D. Pa. 2004) ("a fiduciary relationship arises under Pennsylvania law where one party has reposed a special confidence in another").

939175.1

2001 U.S. Dist. LEXIS 24224 at *41 (emphasis added).[22]   As a front-line insurance producer, Weisz was in a superior position to evaluate and assess the eligibility, acceptability, insurability, and suitability of proposed insureds and the appropriateness of transactions to be presented to American General for underwriting. *See, e.g., McMahon Bros. Realty Co. v. United States Fidelity & Guaranty Co.*, 217 F. Supp. 567 (D. Del. 1963) (noting an agent's superior knowledge when applying to his principal for insurance on his own property); *United States v. Hawley,* 544 F. Supp. 2d 787, 792 (N.D. Iowa 2008), *Summ. J. granted by, different results reached on Recons., in part, adhered to, in part by* 566 F. Supp. 2d 918 (N.D. Iowa 2008) (noting defendant agent's superior knowledge of eligibility of applicants for crop insurance as compared to insurer).  Thus, merely by virtue of his status as an insurance producer for American General, Weisz owed a fiduciary duty to American General as a matter of law.

In fact, Weisz' fiduciary duty is expressly established by the terms and provisions of his contract with American General.  Weisz agreed to submit to American General only those applications for life insurance on proposed insureds who are eligible, acceptable and insurable and whom Weisz genuinely believed to be suitable and appropriate in accordance with American General's practices, policies, and procedures and otherwise consistent with law and public policy.

Weisz's fiduciary duty required him to disclose to American General any information known to him that may affect Goldstein's insurability.  Weisz breached this duty when he represented to American General in the March 14, 2007 Agent's Report, that he was not "aware of any information that would adversely affect any proposed insured's eligibility, acceptability,

---

[22] An insurance agent's fiduciary duty to an insurer is universally recognized throughout the Third Circuit, including in the neighboring state of New Jersey.  *See, e.g., Strawbridge v. New York Life Ins. Co.,* 504 F. Supp. 824 (D.N.J. 1980) (denying plaintiff's motion for summary judgment on insurer's counterclaim for breach of fiduciary duty where the plaintiff, insurer's agent and beneficiary under the Policy in question, perpetrated fraud).

or insurability," and by executing the Agent Certification form on August 22, 2007, in which he represented to American General that he was unaware of any prearranged agreement to transfer the Policy.  Contrary to these certifications, Weisz knew all too well that Goldstein was not a suitable candidate for the insurance applied for, that her income and net worth were grossly overstated in the application, and that she did not intend to obtain the Policy for estate planning purposes, but rather to immediately sell it for fast cash.  If this is true, then Weisz breached his fiduciary duty to American General.

Defendants' reliance upon *Basile v. H & R Block*, 2001 PA Super 136 (Pa. Super. Ct. 2001) and *Wisniski v. Brown & Brown Ins. Co.*, 2006 PA Super 216, P16 (Pa. Super. Ct. 2006) is misplaced, and their interpretation of both cases is misconstrued and exaggerated.  First, neither case discussed fiduciary duty in the context of an insurance producer's duty to an insurer. *Wisnicki* involved a claim by an insured against an insurer, and *Basile* had no connection to the insurance industry whatsoever.  Therefore, both cases are entirely inapposite in light of the expansive authority holding that an insurance producer owes a fiduciary duty to the insurer. Moreover, the court in *Basile* commented that "the concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line" and that "the possibility of a confidential relationship cannot be excluded by a concrete rule." *Id.* at 101; 103.   Similarly, the court in *Wisniski* noted that "the question of whether or not a confidential relationship exists between the parties is ***intensely fact-specific***." *Id*. at 578 (emphasis added).  Thus, it would be particularly inappropriate to dismiss the fiduciary duty claim at the pleading stage.

Contrary to defendants' argument, the law in both Delaware and Pennsylvania clearly recognize and insurance producer's fiduciary duty to its insurer principal.  Furthermore, the

Amended Complaint asserts ample facts that, if proven, would give rise to a claim for breach of

that duty.  Therefore, American General's claim for breach of fiduciary duty should not be

dismissed at this early stage of the litigation.

## VIII.   THE GIST OF AMERICAN GENERAL'S CLAIMS AGAINST WEISZ IS INTENTIONAL FRAUD

The "gist of the action" doctrine does not insulate Weisz from American General's fraud,

conspiracy and fiduciary duty claims because none of those claims arise solely from violation of

his contract obligations, which are collateral and independent. *Fleetboston Fin. Corp. Fleet Nat'l*

*Bank v. Advanta Corp.*, C.A. No. 16912, 2003 Del. Ch. LEXIS 8, 38-39 (Del. Ch. Jan. 22, 2003);

*eToll, Inc. v. Elias/Savion Adver.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  *See also Bash v. Bell*

*Telephone Co. of Pennsylvania*, 601 A.2d 825, 829 (Pa. Super. 1992) (holding fraud actions lie

for breaches of duties imposed by law as a matter of social policy, while contract actions lie only

for breaches of duties imposed by agreement); *Sunburst Paper, LLC v. Keating Fiber Int'l, Inc.*,

C.A. No. 06-3959, 2006 U.S. Dist. LEXIS 78890, *7 (E.D. Pa. Oct. 30, 2006) (holding that if the

duties are collateral to the contract, the claim sounds in tort).   Nor does the gist of the action

doctrine preclude Weisz's liability for fraud, conspiracy and breach of fiduciary duty simply

because Weisz has also breached his contract with American General.  *See e.g., Sands v.*

*Wagner*, 314 Fed. Appx. 506, 508 (3d Cir. 2009) (affirming opinion that gist of the action

doctrine did not bar fraud claim brought for alleged conspiracy among the defendants to defraud

plaintiff of the benefit of her stock purchase agreement where a claim was also brought for

failure to pay pursuant to the agreement); *see also Shenango Inc. v. Massey Coal Sales Co.*, Civil

No. 08-199, 2009 U.S. Dist. LEXIS 82340, *13 (W.D. Pa. Sept. 10, 2009) (finding gist of the

action doctrine inapplicable where conduct exceeds simple contract breach).

Far beyond a mere breach of his agreement to submit only suitable applications, the Amended Complaint asserts intentional fraud on the part of Weisz and his associates with respect to various facts and circumstances.  Among other things, Weisz falsely advised American General that his law firm served as Goldstein's estate planning counsel; he submitted false statements regarding Goldstein; the value and assets contained within Goldstein's estate;  he fabricated her intention to liquidate assets to fund the Policy; he prepared a bogus plan to liquidate assets, and; he concealed the fact that he had recruited Goldstein and others to participate in illegal STOLI transactions in direct contravention of American General's stated policy against participating in such business, which he acknowledged in executing certifications in support of Goldstein's application for the Policy.  Wiesz's fraudulent misrepresentations thoroughly dominate his dealings with American General and serve as the nucleus of all of American General's claims against Weisz and Weisz and Associates.

Moreover, whether a claim sounds in tort or in contract, and therefore is subsumed within the gist of the action doctrine, is a factual inquiry which is not appropriate at the motion to dismiss stage.  Mindful that Rule 8(e)(2) of the Federal Rules of Civil Procedure allow plaintiffs to plead multiple claims as alternative theories of liability, many courts have declined to dismiss on a gist of the action theory.  *See e.g., Partners Coffee Co., LLC v. Oceana Services and Products Co.*, C.A. No. 09-236, 2009 U.S. Dist. LEXIS 113209, *10-11 (W.D. Pa. Dec. 4, 2009); *Orthovita, Inc. v. Erbe*, Civil Action No. 07-2395, 2008 U.S. Dist. LEXIS 11088 (E.D.Pa. Feb. 15, 2008); *Weber Display and Packaging v. Providence Washington Insurance Co.*, Civil Action No. 02-7792, 2003 U.S. Dist. LEXIS 2187 (E.D. Pa. Feb. 10, 2003); *Owen J. Roberts School District v. HTE, Inc.*, Civil Action No. 02-7830 2003 U.S. Dist. LEXIS 2997 (E.D. Pa. Feb. 28, 2003).

For all of these reasons, the gist of the action doctrine is unavailable to insulate Weisz, his firm, or his associates against liability for their intentional fraud.

### IX.   LEAVE TO AMEND SHOULD BE GRANTED IF THE COURT BELIEVES THAT THE PRESENT COMPLAINT IS INADEQUATE TO STATE A CLAIM

The inferences to be drawn from the existing allegations amply satisfy federal pleading requirements that the complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  As noted in *AXA Equitable Life Insurance Co.*, 608 F.Supp.2d at 1353 (citation omitted), "The threshold is 'exceedingly low' for a complaint to survive a motion to dismiss for failure to state a claim upon which relief can be granted."

However, as discussed above, even the cases cited by defendants would require that American General be given leave to amend to allege mutual intent or additional facts concerning specific aspects of the insurance transaction, should this court determine that any facts or causes of action are not sufficiently pleaded.  Amendment should be permitted "unless the claim is clearly frivolous."  *Becher v. University of Neb.,* 191 F.3d 904, 907-08 (8th Cir. 1999) (on motion for leave to amend complaint).  To suggest that American General's pleaded claim is "frivolous," is tantamount to a holding that scores of other actions (some involving these defendants) alleging millions of dollars in similar wagers on the lives of the elderly are frivolous as well.  The facts alleged to date render such a conclusion implausible.  Therefore, although American General contends that all of its claims are properly pleaded, if the Court discerns deficiency, the appropriate remedy would not be dismissal, but rather, leave to amend.

**CONCLUSION**

For all of the foregoing reasons, defendants' motions to dismiss the Amended Complaint

should be denied.

COOLEY MANION JONES LLP

*/s/ Jason A. Cincilla*
Jason A. Cincilla (#4232)
Amaryah K. Bocchino (#4879)
500 Delaware Avenue, Suite 710
Wilmington, DE  19801
(302) 657-2100
jcincilla@cmjlaw.com
abocchino@cmjlaw.com
 *Attorneys for Plaintiff*
 *American General Life Insurance Company*

**OF COUNSEL**
Robert P. Lesko
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
33 Washington Street
Newark, NJ 07102-3017
(973) 735-5779
robert.lesko@wilsonelser.com

Dated: January 15, 2010

56 939175.1